738 A.2d 380 (1999)
325 N.J. Super. 184
STATE of New Jersey, Plaintiff-Respondent,
v.
Brian Maurice FULSTON, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted September 23, 1999.
Decided October 20, 1999.
*381 Ivelisse Torres, Public Defender, attorney for defendant-appellant (Jean B. Bennett, Designated Counsel, of counsel and on the brief).
Donald C. Campolo, Acting Essex County Prosecutor, attorney for plaintiff-respondent (Joan E. Love, Assistant Prosecutor, of counsel and on the brief).
Before Judges BAIME, BROCHIN and EICHEN.
The opinion of the court was delivered by
BAIME, P.J.A.D.
A jury acquitted defendant of purposeful or knowing murder (N.J.S.A. 2C:11-3a(1) and (2)), but found him guilty of aggravated manslaughter (N.J.S.A. 2C:11-4) and endangering the welfare of a child (N.J.S.A. 2C:24-4). The trial court merged the offenses and sentenced defendant to twenty-five years imprisonment with an eight year parole ineligibility term on the conviction for aggravated manslaughter. Although additional arguments are advanced, defendant's principal contention is that the trial court erroneously excluded evidence that the State's chief witness committed the criminal act. We agree and reverse defendant's conviction.

I.
Damaris Conyers and her one year old son, Michai, resided on the third floor of an apartment building owned by Damaris's nephew, Wayne Harris. Harris lived on the first floor with his daughter, Destiny. Damaris was "perceptually impaired," and thus her mother, Mary Conyers, served as Michai's guardian. Because of Damaris's condition, her relatives were not enthusiastic when she became engaged in a romantic relationship with defendant, who resided in a building across the *382 street. Nevertheless, defendant often visited Damaris at her apartment.
It is undisputed that at approximately 4:00 p.m. on October 15, 1996, emergency personnel responded to Damaris's apartment, where they observed defendant performing CPR on Michai. The child had no pulse and appeared blue in color. One of the paramedics removed Michai's shirt and observed recent and older black and blue marks. Michai was immediately transported to a nearby hospital where he was pronounced dead. The emergency room physician noted bruises over the child's stomach, a blackened left eye, dried blood on his lip, and black and blue marks on his forehead. X-rays revealed posterior rib fractures dating back approximately six weeks, a new posterior rib fracture on the child's left side, and a fracture of the right zygomatic bone near the temple. A subsequent autopsy disclosed substantial bruises about the head, probably caused by at least three separate blows. There was hemorrhaging in the child's abdomen which appeared "fresh," probably caused by twelve "different impacts." There was internal bleeding caused by lacerations of the liver and injuries to the colon and small bowel caused by "significant force."
It is uncontroverted that the injuries that caused Michai's death occurred on the morning of October 15, 1996, and that only defendant and Damaris had access to the child at that time. The principal question at trial was which of the two individuals committed the homicidal act.
Damaris, who was charged with endangering the welfare of the child but granted immunity, claimed that she left Michai in her apartment under defendant's care while she babysat for Destiny. She testified that Michai was in good physical health when she left him with defendant, who was awake, but sprawled on the bed. According to Damaris, defendant appeared at the door of Harris's apartment later in the morning, but she was busy administering medicine to Destiny and dismissed his request to talk to her. Sometime thereafter, defendant shouted from the stairway, and Harris, who had returned to his apartment, told Damaris to "go upstairs." Damaris testified that when she returned to her apartment, she observed Michai laying across the bed. His face appeared blue in color and there were cuts on his face and lips. An ambulance was summoned, and the child was transported to the hospital.
At the hospital, defendant told Harris that he was asleep when Damaris left the baby with him and that Michai was on his stomach in the bed when he awoke. When first interviewed by Essex County Prosecutor's Investigator, Kirk Schwindel, defendant explained that when he awoke, "he observed the baby was wheezing and having a problem," and that he then sought Damaris's assistance. In a subsequent interview with Schwindel, defendant related that as he was sleeping, he felt Michai "climbing ... over him," and he pushed the child away. Defendant said that he pushed Michai toward the headboard of the bed.
Defendant elected to testify. His description of the events leading to Michai's death was markedly different than that offered by Damaris. Defendant testified that he did not go to work on the day in question because he was suffering from a toothache. After taking several medications that made him drowsy, defendant fell asleep in Damaris's bed. At some point, defendant awoke. Damaris was holding Michai in her arms. Defendant claimed that he again fell asleep. When he awoke, Michai was in the bed. Because the baby was wheezing and appeared inert, defendant summoned Damaris who was in Harris's apartment. Defendant testified that when questioned by Schwindel, he assumed that he had inadvertently injured the baby while he was asleep. However, when he later learned of the severity of the child's injuries, he realized that he could not have been responsible.
To bolster the claim that Damaris killed Michai, the defense offered several witnesses. *383 They would have testified that Damaris "physically abused" the child by "striking" and "dropping" him, often leaving the baby unattended. On at least one occasion, Damaris had confessed that "she wished she had never had Michai." The defense sought to admit this evidence to prove Damaris's homicidal motive and to rebut her testimony that she never hit the baby and was not unhappy that he was born. In a lengthy colloquy with the trial court, defense counsel explained that "two adults" had access to Michai on the morning of his death and that it was "more likely" that Damaris "inflicted [the fatal] injuries." The attorney argued further that Damaris's complaint to one of the witnesses that "she wished she never had a baby" constituted compelling evidence of her motive to kill and rebutted her claim that she was happy with her status as mother of the child.
The trial court excluded the proffered evidence under N.J.R.E. 404(b). Specifically, the court concluded that prior acts of child abuse were not admissible because such evidence merely established the "disposition" of Damaris to commit crimes which was unanchored to the death of the victim. The trial court added that even if otherwise admissible, the probative value of the evidence was substantially outweighed by its capacity to cause prejudice under N.J.R.E. 403.

II.
The crucial legal issue is the extent to which N.J.R.E. 404(b) bars admission of "other crimes" evidence when the defendant seeks to admit such proofs for the purpose of exculpation. N.J.R.E. 404(b) and its predecessor, Evid. R. 55, prohibit the evidential use of the commission of crime by an accused on another occasion to prove his disposition to commit the offense for which he is being tried. The exclusionary aspect of the prohibition is not founded upon the absence of any probative value of "other crimes" evidence. In many settings, evidence that the accused has committed other similar crimes and harbors a criminal propensity is extremely compelling. The strong policy against the admission of "other crimes" evidence is instead grounded in its distinct capacity to prejudice the accused. Even instructions by the trial judge may not satisfactorily insulate the defendant from the hazard of an unjust conviction resting on nothing more than the jury's view that the defendant is an evil person. But when the defendant offers proof of that kind exculpatorily, prejudice to the defendant is no longer a factor. More specifically, there is no danger that the jury will convict the defendant of the crime being tried merely because of his sordid, criminal past.
These considerations have led our Supreme Court to adopt a less rigorous standard when the defense seeks to admit "other crimes" evidence defensively. In State v. Garfole, 76 N.J. 445, 388 A.2d 587 (1978), the Court held that "simple relevance to guilt or innocence should suffice as the standard of admissibility," and that "an accused is entitled to advance in his defense any evidence which may rationally tend to refute his guilt or buttress his innocence of the charge made." Id. at 452-53, 388 A.2d 587. Thus, under Garfole, "a criminal defendant offering "other crimes" evidence to establish innocence need not meet as high a... standard of relevancy as the State when it seeks to admit "other crimes" evidence to prove a defendant's guilt." State v. Gookins, 135 N.J. 42, 47, 637 A.2d 1255 (1994).
That is not to say that simple relevancy is the only factor to be considered. Under N.J.R.E. 403, "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of" undue prejudice, confusion of issues, undue delay, or needless presentation of cumulative evidence. Although these considerations are ordinarily brought to bear when the State offers "other crimes" evidence, see State v. Cofield, 127 N.J. 328, 338, 605 A.2d 230 (1992); Abraham P. Ordover, *384 Balancing the Presumptions of Guilt and Innocence: Rules 404(b), 608(b), and 609(a), 38 Emory L.J. 135, 160-61 (1989), they also must be considered when the defendant presents such proofs. "[W]hat is called for ... is a highly discretionary determination as to the admissibility of the defendant's proffered evidence" which weighs and takes into account the competing considerations listed in N.J.R.E. 403. State v. Garfole, 76 N.J. at 457, 388 A.2d 587.
We are concerned here with "evidence [of] third party guilt." State v. Timmendequas, 161 N.J. 515, 620, 737 A.2d 55 (1999). It is well established that a defendant "is entitled to prove his innocence by showing that someone else committed the crime." State v. Koedatich, 112 N.J. 225, 297, 548 A.2d 939 (1988), cert. denied, 488 U.S. 1017, 109 S.Ct. 813, 102 L.Ed.2d 803 (1989); see also Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); State v. Loftin, 146 N.J. 295, 345, 680 A.2d 677 (1996); State v. Millett, 272 N.J.Super. 68, 98, 639 A.2d 352 (App.Div.1994). To be admissible, the proofs offered must have "a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case." State v. Sturdivant, 31 N.J. 165, 179, 155A.2d 771 (1959), cert. denied, 362 U.S. 956, 80 S.Ct. 873, 4 L.Ed.2d 873 (1960). However, it is not enough to prove some hostile event and leave its connection with the case to mere conjecture. "Somewhere in the total circumstances there must be some thread capable of inducing reasonable [persons] to regard the event as bearing upon the State's case." Ibid. To be admissible, the third party evidence need not show substantial proof of a probability that the third person committed the act; it need only be capable of raising a reasonable doubt of the defendant's guilt. State v. Koedatich, 112 N.J. at 299, 548 A.2d 939.
We are convinced that this threshold standard was met in this case. The evidence presented at trial established beyond peradventure that either defendant or Damaris committed the homicidal act. Damaris thus harbored a substantial interest in testifying that defendant was alone with the baby when the fatal injuries were sustained. But defendant claimed that he last saw the child in Damaris's arms before falling asleep. It is undisputed that Michai suffered fractures of the ribs approximately six weeks before his death. The fact that witnesses observed Damaris abusing the child near the time of the homicide had a legitimate tendency to support the inference that she, and not defendant, killed the victim. This evidence was particularly poignant in light of Damaris's confession to one of the proffered witnesses that she wished Michai had never been born. The compelling nature of this evidence is perhaps best illustrated by the lengthening line of decisions permitting the State to admit prior acts of violence against the victim by the defendant to establish motive and intent. See, e.g., State v. Nance, 148 N.J. 376, 388, 689 A.2d 1351 (1997); State v. Marrero, 148 N.J. 469, 485-86, 691 A.2d 293 (1997); State v. Clausell, 121 N.J. 298, 321-23, 580 A.2d 221 (1990); State v. Pitts, 116 N.J. 580, 599-608, 562 A.2d 1320 (1989); State v. Machado, 111 N.J. 480, 488-89, 545 A.2d 174 (1988); State v. G.S., 278 N.J.Super. 151, 161-62, 650 A.2d 819 (App.Div.1994), rev'd on other grounds, 145 N.J. 460, 678 A.2d 1092 (1996); State v. Green, 274 N.J.Super. 15, 31-32, 643 A.2d 18 (App. Div.), certif. denied, 137 N.J. 312, 645 A.2d 141 (1994); State v. Engel, 249 N.J.Super. 336, 372-74, 592 A.2d 572 (App.Div.), certif. denied, 130 N.J. 393, 614 A.2d 616 (1991); State v. Breakiron, 210 N.J.Super. 442, 460-61, 510 A.2d 80 (App.Div.1986), rev'd on other grounds, 108 N.J. 591, 532 A.2d 199 (1987). If such evidence may be admitted by the prosecution with the attendant danger of prejudicing the accused, then it certainly should be admitted by the defense to show that another person committed the crime for which the defendant is charged.
*385 We recognize that questions pertaining to the admissibility of "other crimes" evidence are peculiarly within the trial judge's domain. Because of its intimate knowledge of the case, the trial court is in the "best position to engage in th[e] balancing process" we have described. State v. Ramseur, 106 N.J. 123, 266, 524 A.2d 188 (1987), cert. denied, 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993). We are nevertheless convinced that the excluded evidence here was highly probative and the danger of undue prejudice, confusion of the issues, and undue consumption of time was virtually nonexistent. The exclusion of the evidence undermines our confidence in the validity of the jury's verdict.
We thus reverse defendant's conviction and remand for a new trial.