865 A.2d 660

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. NATHAN COTTO, DEFENDANT–APPELLANT.

Argued September 27, 2004—Decided February 1, 2005.

318

*Alan I. Smith,* Designated Counsel, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Elizabeth M. Devine,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

Justice ZAZZALI delivered the opinion of the Court.

A jury convicted defendant of robbery, burglary, terroristic threats, and other charges after he and an accomplice burglarized his ex-girlfriend's apartment while she, her pregnant sister, and her young niece and nephew were present.

In this appeal, defendant claims, as reversible error, that the trial court incorrectly instructed the jury on the State's burden on the issue of identification; that the trial court improperly admitted certain statements as excited utterances; that the trial court erred when it precluded defendant's proffered evidence of third-party guilt; and that the trial court improperly allowed testimony, and the prosecutor's use of that testimony in summation, regarding certain out-of-court statements made by a non-testifying witness.

For the reasons discussed more fully below, we do not find reversible error in the trial court proceedings.

## I.

On a February evening in 2000, Tina Mutcherson was staying at the apartment of her boyfriend in Vineland, New Jersey. At approximately 11:30 p.m., she saw a man trying to get into a neighboring apartment through a bedroom window. Tina's sister, Tiffany Mutcherson, lived in that apartment and was babysitting Tina's two children at the time. When Tina went next door to warn her sister of the intruder, another man standing in the hallway struck Tina in the back of the head with a gun. That man, later identified as defendant, was wearing blue jeans and a black ski mask. After he pushed Tina into Tiffany's apartment, the first man, wearing a black ski mask and gray sweatpants, followed Tina and defendant through the door. That assailant also brandished a handgun. When Tina's daughter, Shanequa, began to cry, the two men directed Tiffany, Tina, and Shanequa

into Tiffany's bedroom where Tina's son, Allen, was sleeping. The man wearing gray sweatpants threatened to kill Allen after he began crying.

Once in the bedroom, the two men asked the sisters, "Where's the money at?" When Tiffany replied that she did not have any money, the assailant wearing gray sweatpants punched her. Defendant removed Tina's jewelry, took a couple of dollars from Shanequa, and pocketed forty-two dollars sitting on Tiffany's bureau. Defendant then led Tina, Shanequa, and Allen into the living room and ordered them to sit down.

When the robber wearing blue jeans returned to the bedroom, the mask had moved, and Tiffany saw his eyes and nose. Based on that observation and the sound of his voice, Tiffany recognized the robber as defendant, her ex-boyfriend. Tiffany had dated defendant for two to three months during the preceding summer. Tiffany testified that, from time to time, he had stayed at her apartment for more than one night while they maintained a dating relationship. Defendant also asked Tiffany, "Where's the can at, where's the tin can at?", in an apparent reference to a tin can in which Tiffany stored her waitress tips when she worked at a casino. Tiffany did not confront defendant because she feared that he would harm her if he knew that she recognized him.

The men refused to leave until they "got something." Defendant found Tiffany's pocketbook and a picture of Tiffany with her new boyfriend. Defendant showed the other man the picture and commented, "Look at this sh* *." The other assailant kicked Tiffany, who was pregnant, in the stomach. Tina begged him to stop and told him that Tiffany was pregnant. He responded by holding a gun to Tina's eye and asking, "Do it look like I give a f* *k?"

When the two men decided to leave, they wanted to take Allen with them. In this exchange, defendant referred to Allen by his first name, leading Tina to believe that the robber was familiar with her and her sister. Tiffany insisted that the assailants take her with them instead. They agreed and, after Tiffany put on

shoes and a coat, the three left the apartment. Tiffany walked with the robbers for about one-half a mile before they released her. They threatened to kill her unless she walked back slowly and did not call the police.

Meanwhile, Tina's children locked themselves in her boyfriend's apartment. Tina called her boyfriend from his grandmother's apartment to tell him that she had been robbed. When Tiffany returned, she told Tina that the man wearing the blue jeans was defendant. Tiffany then called the police and a friend. Tina's boyfriend, Pete Thomas, arrived with Tiffany's and Tina's cousin, Terry Morgan. Tiffany told Thomas and Morgan that defendant and another man had robbed them. Thomas and Morgan left the scene to look for defendant at a nearby bar, the Citizen's Club.

Shortly thereafter, Officer Angel Minguela and Sergeant Harry Swain responded to the crime scene, arriving approximately fifteen to twenty minutes after the robbery ended. They reviewed the crime scene, and described Tiffany's apartment as "ransacked." Minguela interviewed Tina, whom he described as a "nervous [w]reck." Swain spoke with Tiffany, who appeared "very upset" and was "shaking uncontrollably." At that time, Tiffany told Swain that one of the robbers was defendant.

Thomas, Tina's boyfriend, returned to the scene and spoke to the police. Based on that conversation, the police and Tina then went to the Citizen's Club, approximately one-and-a-half miles from the crime scene, to look for defendant. The Club, however, had closed by the time they arrived. The police took the sisters to the police station where they gave statements. In her statement, given approximately forty-five minutes after the robbery, Tiffany again named defendant as one of the robbers.

Defendant was tried and convicted on two counts of first-degree robbery (*N.J.S.A.* 2C:15–1a(1)), three counts of second-degree possession of a weapon for an unlawful purpose (*N.J.S.A.* 2C:39–4a), three counts of fourth-degree aggravated assault with a firearm (*N.J.S.A.* 2C:12–1b(4)), one count of third-degree unlawful possession of a weapon (*N.J.S.A.* 2C:39–5b), one count of second-

degree burglary (*N.J.S.A.* 2C:18–2), and three counts of third-degree terroristic threats (*N.J.S.A.* 2C:12–3a). The trial court sentenced defendant as a persistent offender. On the first robbery count, defendant received a fifty-year extended term, subject to a NERA parole disqualifier of forty-two and a half years. The sentences on the other convictions were either merged or made to run concurrently with that extended term.

The Appellate Division affirmed defendant's conviction in an unpublished opinion. The panel remanded for re-sentencing, however, ordering the trial court to compute the NERA disqualifier based not on the extended term, but on defendant's twenty-year base term for the supporting first-degree robbery conviction. The trial court re-sentenced defendant accordingly.

We granted defendant's petition for certification, *State v. Cotto,* 179 *N.J.* 309, 845 *A.*2d 134 (2004), on four issues: the failure to give an identification instruction, the admission of excited utterances, the preclusion of evidence of third-party guilt, and the admission of out-of-court statements. We now address each of those issues.

## II.

### A.

█ Although he did not object to the jury charge at trial, defendant argues that the trial court erred in not specifically instructing the jury on the issue of identification.

█ When identification is a "key issue," the trial court must instruct the jury on identification, even if a defendant does not make that request. *State v. Green,* 86 *N.J.* 281, 291, 430 *A.*2d 914 (1981); *State v. Davis,* 363 *N.J.Super.* 556, 561, 833 *A.*2d 1094 (App.Div.2003). Identification becomes a key issue when "[i]t [is] the major ... thrust of the defense," *Green, supra,* 86 *N.J.* at 291, 430 *A.*2d 914, particularly in cases where the State relies on a single victim-eyewitness, *see State v. Frey,* 194 *N.J.Super.* 326, 329, 476 *A.*2d 884 (App.Div.1984) ("The absence of any eyewitness

other than the victim and defendant's denial of guilt, made it essential for the court to instruct the jury on identification.").

Failure to issue the instruction may constitute plain error. *Green, supra,* 86 *N.J.* at 289, 430 *A.*2d 914. The determination of plain error depends on the strength and quality of the State's corroborative evidence rather than on whether defendant's misidentification argument is convincing. *Davis, supra,* 363 *N.J.Super.* at 561, 833 *A.*2d 1094. Thus, the Appellate Division in *Davis, supra,* held that the State may sometimes present such overwhelming corroborative evidence that the "failure to give an identification instruction does not constitute error," but such cases are the exception. *Ibid.* (Internal citation omitted). Rather, the trial court is required to issue a "specific instruction" even when defendant's misidentification argument is "thin." *Ibid.*

### B.

In this case, because defendant focused on undermining the credibility of the State's witnesses with prior inconsistent statements and offered an alibi defense, identification was a "key issue." *See Green, supra,* 86 *N.J.* at 291, 430 *A.*2d 914; *Frey, supra,* 194 *N.J.Super.* at 329, 476 *A.*2d 884.

However, despite the trial court's failure to provide a detailed identification instruction, the trial court did specifically explain to the jury that the State bears the burden of proving beyond a reasonable doubt "each and every element of the offense, including that of the defendant's presence at the scene of the crime and his participation in the crime." Unlike the trial court in *Davis, supra,* here, the trial court instructed the jury on the State's burden of proving beyond a reasonable doubt that defendant was the individual that committed the crime. The instruction in this matter is substantially the same as the model instruction that the Appellate Division, in *Davis, supra,* would have required to uphold the conviction in a case of a weak misidentification argument. The *Davis* instruction stated, in pertinent part: "You must determine ... not only whether the State has proved each and every element

of the offense charged beyond a reasonable doubt, but also whether the State has proved beyond a reasonable doubt that this defendant is the person who committed it." *Davis, supra,* 363 *N.J.Super.* at 562, 833 *A.*2d 1094 (quoting Model Jury Charge (Criminal), "Identification" (1999)). The instruction given in this case, in *Davis,* and in the model charge all emphasize the same common denominator: the State bears the burden of proving beyond a reasonable doubt that the defendant is the wrongdoer. Although the court here did not use the word "identification" in charging the jury, and could have given a more detailed instruction, it nonetheless clearly explained the State's burden to the jury. Therefore, we hold that the trial court did not commit error, much less plain error, when it instructed the jury on identification.

 Finally, the strength and quality of the State's corroborative evidence rendered harmless any deficiency in the instruction and precludes a finding of plain error. *See R.* 2:10–2. Tina testified that defendant called her son Allen by name, and that defendant referred to a tip can that was known only to defendant and one other person. Tiffany recognized defendant based on a partial view of his face and the sound of his voice. Tiffany's ability to identify defendant stems from their previous romantic relationship which, we may assume, would enable her to recognize defendant. In sum, because the State introduced significant corroborating evidence, a detailed identification instruction was unnecessary.

### III.

### A.

Defendant maintains that the trial court impermissibly applied the excited utterance exception to admit the statements that Tina and Tiffany made to the police at the police station and at the apartment.

The excited utterance exception to the hearsay rule allows a trial court to admit certain out-of-court statements "relating to a

startling event or condition made while the declarant was under the stress of excitement caused by the event or condition and without opportunity to deliberate or fabricate." *N.J.R.E.* 803(c)(2). Such statements are admissible under the rationale that " 'excitement suspends the declarant's powers of reflection and fabrication,' consequently minimizing the possibility that the utterance will be influenced by self interest and therefore rendered unreliable." *State v. Long*, 173 *N.J.* 138, 158, 801 *A.*2d 221 (2002) (quoting 2 *McCormick on Evidence* § 272, at 204–05 (5th ed.1999)). We explained in *Cestero v. Ferrara*, 57 *N.J.* 497, 504, 273 *A.*2d 761 (1971), that a statement constitutes an excited utterance when "the circumstances reasonably warrant the inference that the statement was made as an uncontrolled response to the shock of the event before reasoned reflection could have stimulated a self-serving response."

Consistent with the rationale for the excited utterance exception, in *Long, supra*, we further explained that when "deciding whether there was an opportunity to fabricate or deliberate, a court should consider the element of time, the circumstances of the incident, the mental and physical condition of the declarant, and the nature of the utterance." 173 *N.J.* at 159, 801 *A.*2d 221 (internal quotation marks and citation omitted). Although each of these factors is important, "[t]he crucial element is the presence of a continuing state of excitement that contraindicates fabrication and provides trustworthiness." *State v. Lyle*, 73 *N.J.* 403, 413, 375 *A.*2d 629 (1977). Thus, in this fact-sensitive analysis, a court must determine "whether the facts and circumstances reasonably warrant the inference that declarant was still under the stress of excitement caused by the event." *State v. Baluch*, 341 *N.J.Super.* 141, 182, 775 *A.*2d 127 (App.Div.2001).

In *State v. Branch*, 182 *N.J.* 338, 865 *A.*2d 673, 2005 *WL* 221198 (2005), also decided today, the Court sets forth a comprehensive historical analysis of the excited utterance rule. In doing so, we express concerns regarding both the "interpretative expansion" of the rule, *id.* at 357, 865 *A.*2d 673, 2005 *WL* 221198, *13, and case

law that has paid only nominal attention to "the opportunity to deliberate or fabricate" element of *N.J.R.E.* 803(c)(2), *id.* at 357, 865 *A.*2d 673, 2005 *WL* 221198, *14.

## B.

In this case, because the sisters had an "opportunity to deliberate or fabricate" when they spoke to the police at the station and at the apartment, we find that they were not in a continuing state of excitement under *N.J.R.E.* 803(c)(2). Our conclusion does not suggest that the sisters did deliberate or fabricate, but only that they had the opportunity to do so.

*The Statements at the Police Station*

█ We first consider the factors described in *Long, supra.* The sisters gave their formal statements at the station approximately thirty to forty-five minutes after the robbery. That time lapse served as a cooling-off period during which the sisters achieved some physical and emotional distance from the robbery as they accompanied the police to the Citizen's Club and then to the station. The delay undermined the trustworthiness inherent in an admissible excited utterance.

Additionally, neither sister suffered any serious injury that impaired her ability to think clearly or to reflect on the robbery as she gave her statement to the police at the station. The nature of the sisters' statements also suggests that the trial court erred in admitting the statements. Although a response to a question may constitute an excited utterance, here, the sisters would have had an opportunity to calm themselves and provide thoughtful answers to the questions the police posed during the formal interview at the station. Thus, this matter is unlike the situations in which we have recognized that a victim's spontaneous reaction guarantees trustworthiness. *See, e.g., State v. Simmons,* 52 *N.J.* 538, 247 *A.*2d 313 (1968) (construing hearsay exception broadly and admitting as excited utterance victim's spontaneous response when presented with her attacker).

In light of those factual circumstances we cannot conclude that Tiffany's and Tina's statements to the police at the station were of the type contemplated by *N.J.R.E.* 803(c)(2). Admitting those statements was inconsistent with the rationale of the excited utterance exception, i.e., that "excitement suspends the declarant's powers of reflection and fabrication." *Long, supra,* 173 *N.J.* at 158, 801 *A.*2d 221 (internal quotation marks omitted). Therefore, we conclude that the trial court erred in admitting them.

*The Statements at the Apartment*

The circumstances at Tiffany's apartment, where the sisters made their initial statements to the police, present a closer question. The sisters first reported the robbery when Tiffany returned to the apartment after being forced to walk for several blocks with the assailants. Approximately five minutes after the sisters reported the robbery and fifteen to twenty minutes after the assailants left the apartment, Officer Minguela arrived on the scene and interviewed Tina and Tiffany. The sisters briefly recounted what had happened during the robbery, and Tiffany named defendant as one of the robbers.

Because the sisters had an opportunity to deliberate, their statements to police at the apartment should not have been admitted at trial. During the time it took her to walk back to the apartment, Tiffany had, at least, several minutes to reflect on the robbery and who could have committed it. However, as we recognize in *Branch, supra,* today, the time lapse is not the most important consideration. *Branch, supra,* at 366, 865 *A.*2d 673, 2005 *WL* 221198, *14. Rather, the nature of the statement, including the "nature of the utterance," determines its admissibility. *Long, supra,* 173 *N.J.* at 159, 801 *A.*2d 221 (citation omitted). Here, the sisters' statements in response to police questioning constituted "narrative[s] of a past occurrence" and not statements "exclamatory, and coincident with the happening of the" robbery. *Blackman v. W. Jersey & Seashore R.R. Co.,* 68 *N.J.L.* 1, 2, 52 *A.* 370 (Sup.Ct.1902). We have traditionally held that such statements are not sufficiently spontaneous to assure reliability, and we

so hold today. For those reasons, we conclude that the trial court also erred in admitting those statements.

*Harmless Error*

 Although it was error to admit the testimony of the police officers concerning the statements made at the police station and the apartment, defendant suffered no significant harm from that testimony. It only echoed the earlier identification testimony and did not introduce new information to the jury that the jury would have been unable to consider otherwise. The sisters previously had identified defendant in court. Here, unlike in *Branch, supra,* the identification testimony of the victim-witnesses was considerably more substantial because one of the women personally knew defendant from a previous romantic relationship. Additionally, defendant called Tina's son by name and referred to Tiffany's secret hiding place for her money.

Importantly, unlike the defendant in *Branch, supra,* this defendant had the opportunity to cross-examine the sisters when they testified. In fact, defense counsel attempted to undermine their credibility with a thorough cross-examination, thereby reducing the danger inherent in out-of-court statements. Although the decision to call or not to call an available out-of-court declarant is not dispositive of the excited utterance issue, it does factor into the analysis. *See Branch, supra,* at 353, 865 *A.*2d 673, 2005 *WL* 221198, *7. In this case, that consideration indicates that the admission was not "clearly capable of producing an unjust result." *R.* 2:10–2.

Finally, although defendant complains that the police testimony made the sisters' identifications appear more certain than they actually were, that contention is without merit. Had the trial court barred the hearsay statements, the police still could have testified to the degree of certainty with which the sisters identified defendant without repeating the out-of-court statements. For those reasons, we hold that the trial court committed harmless error.

## IV.

### A.

Defendant contends that the trial court violated his Sixth Amendment rights when it precluded his proffer of third-party guilt.

On the morning of the first day of trial, defense counsel asserted that, while defendant was in police custody, defendant received information from a fellow inmate, Ralph Morgan, a blood relative of Terry Morgan and Tina and Tiffany Mutcherson. That information allegedly implicated Terry Morgan and an individual called "Corrupt" in the robbery. According to defendant, Ralph Morgan alleged that Terry Morgan and "Corrupt" had planned to rob Tiffany's boyfriend's apartment, not Tiffany's apartment. Nonetheless, after Tiffany was robbed, Ralph Morgan "assumed that Terry had carried out the robbery [Terry] had told him about." Ralph Morgan repeated that information to defendant's investigator, but refused to testify at trial or to verify the information. The trial court denied defendant's proffer of third-party guilt because the "defense position ... [was] so speculative and ... full of conjecture and hearsay ... [that] the prejudicial value ... outweigh[ed] the probative value."

Courts must provide criminal defendants with a " 'meaningful opportunity to present a complete defense.' " *State v. Garron*, 177 *N.J.* 147, 168, 827 *A.2d* 243 (2003) (quoting *Crane v. Kentucky*, 476 *U.S.* 683, 690, 106 *S.Ct.* 2142, 2146, 90 *L.Ed.2d* 636, 645 (1986)), *cert. denied*, 540 *U.S.* 1160, 124 *S.Ct.* 1169, 157 *L.Ed.2d* 1204 (2004). We have held that, by implication, a complete defense includes a criminal defendant's right to introduce evidence of third-party guilt "if the proof offered has a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case." *State v. Fortin*, (*Fortin II* ), 178 *N.J.* 540, 591, 843 *A.2d* 974 (2004); *see also State v. Sturdivant*, 31 *N.J.* 165, 179, 155 *A.2d* 771 (1959), *cert. denied*, 362 *U.S.* 956, 80 *S.Ct.* 873, 4 *L.Ed.2d* 873 (1960); *State v. Koedatich*, 112

N.J. 225, 301–02, 548 A.2d 939 (1988) (noting continued viability of *Sturdivant* standard). That standard does not require a defendant to provide evidence that substantially proves the guilt of another, but to provide evidence that creates the possibility of reasonable doubt. *Fortin II, supra,* 178 N.J. at 591, 843 A.2d 974; *State v. Fulston,* 325 N.J.Super. 184, 191, 738 A.2d 380 (App.Div. 1999) (citing *Koedatich, supra,* 112 N.J. at 299, 548 A.2d 939), *certif. denied,* 163 N.J. 397, 749 A.2d 371 (2000).

However, a defendant cannot simply seek to introduce evidence of "some hostile event and leave its connection with the case to mere conjecture." *Sturdivant, supra,* 31 N.J. at 179, 155 A.2d 771. Rather, a defendant's proofs must be capable of demonstrating "some link between the third-party and the victim or the crime." *Koedatich, supra,* 112 N.J. at 301, 548 A.2d 939; *see also Sturdivant, supra,* 31 N.J. at 179, 155 A.2d 771.

The determination of whether the proffered evidence in any given case meets the *Sturdivant* standard requires a fact-sensitive inquiry. *Koedatich, supra,* 112 N.J. at 300, 548 A.2d 939. For this reason, trial courts retain broad discretion to admit or preclude evidence of third-party guilt. *Fortin II, supra,* 178 N.J. at 591, 843 A.2d 974; *Koedatich, supra,* 112 N.J. at 300, 548 A.2d 939. We will reverse only if the defendant can establish an abuse of that discretion. *Fortin II, supra,* 178 N.J. at 591, 843 A.2d 974.

### B.

Defendant has failed to establish that the trial court erred when it precluded the proffered evidence of third-party guilt. Although Ralph Morgan implicated the sisters' cousin, Terry Morgan, in the robbery, the record in this appeal does not support even the "mere conjecture" of Terry Morgan's guilt. *See e.g., Sturdivant, supra,* 31 N.J. at 179, 155 A.2d 771; *State v. Bull,* 268 N.J.Super. 504, 512, 634 A.2d 101 (1993). For example, the actual robbery was inconsistent with the alleged plan because Ralph Morgan stated that Terry Morgan planned to rob the apartment of Tiffany's boyfriend, not Tiffany. Moreover, defendant's own alibi witness

undermined Ralph Morgan's theory when she testified that she saw Pete Thomas and Terry Morgan run out of the Citizen's Club to assist Tina after learning that she had been robbed. Finally, Tiffany positively identified defendant, her former boyfriend, as one of the robbers. She did not identify her cousin, Terry. Because the proffered evidence does not demonstrate a reasonable doubt as to the identity of the robbers, defendant cannot convincingly link Terry Morgan to the crime, nor can he satisfy the *Sturdivant* standard.

 Even if defendant had satisfied the *Sturdivant* standard, the trial court could have precluded the proffered evidence on two alternative grounds. First, when a criminal defendant seeks to cast blame on a specific third-party, he or she must notify the State in order to allow the State an opportunity to properly investigate the claim. *State v. Loftin (Loftin I)*, 146 *N.J.* 295, 345–46, 680 *A.2d* 677 (1996). This defendant did not notify the State of Ralph Morgan's statement until the morning of trial. Although defendant argues that he did not receive the information until the last minute, the fact remains that the State did not have a meaningful opportunity to investigate or to interview the informant. Second, to be admissible, evidence of third-party guilt must "satisfy the standards of the *New Jersey Rules of Evidence*," *Fortin II, supra,* 178 *N.J.* at 591, 843 *A.2d* 974, because "compl[iance] with established rules of procedure and evidence . . . assure[s] both fairness and reliability in the ascertainment of guilt or innocence." *Chambers v. Mississippi*, 410 *U.S.* 284, 302, 93 *S.Ct.* 1038, 1049, 35 *L.Ed.2d* 297, 313 (1973). Here, as the trial court observed, the proffered evidence consisted entirely of inadmissible hearsay and could not have been presented at trial in any case.

## V.

### A.

 Finally, defendant argues that the trial court violated his Sixth Amendment right to confront and cross-examine witnesses

when it allowed Tina to testify about statements that Pete Thomas, her boyfriend, made to police on the night of the robbery. Defendant also objects to the prosecutor's use of those statements in summation.

During trial, the State questioned Tina about the night of the robbery. Tina confirmed that "based on information received" from Thomas, the police went to the Citizen's Club to look for defendant. On cross-examination, defense counsel questioned Tina further about the course of events on the evening of the robbery and the extent of the police investigation. In reply, Tina stated, somewhat ambiguously: "That's when Pete came back in the cab and from what the description I gave he saw at the club so me and him and the officers went down to the club." Tina's statement implies that Thomas gave a description of defendant that caused the police to go to the Citizen's Club.

Due to the confusion that the defense question engendered, the State attempted to ask Tina on redirect examination why she and the police went to the Citizen's Club. After defendant objected, the trial court stated at sidebar that defense counsel had opened the door to that line of questioning. Defense counsel then agreed with the court that the State could "ask the question why did you go to the Citizen's Club." Consistent with that agreement, counsel did not object on hearsay grounds when the State suggested and Tina confirmed, in a series of leading questions and answers, that Thomas told the police that defendant was at the Citizen's Club, wearing clothes that matched Tina's description of defendant. However, defense counsel did object to their leading nature. To assist our analysis, we set forth the colloquy:

> Q. So is the reason why you went to the Citizen's Club with the police because when Pete came there originally you told Pete what the defendants were wearing?
>
> A. Right.
>
> Q. And then after Pete came back from the Citizen's Club he had a conversation with you and the police?
>
> A. Right.
>
> Q. And as a result of that conversation—

[DEFENSE COUNSEL.] Judge, I'm going to object to the leading questions at this point.

[PROSECUTOR.] Well, I'm summarizing to get to—

[THE COURT.] I'm going to allow it. Go ahead. She's going to get to a question.

[PROSECUTOR.] As a result of this conversation with Pete and the police did Pete tell you that the man that you said wearing that clothing was—

A. Nate Cotto.

Q. —what Cotto was wearing down at the Citizen's Club?

A. Yes.

Furthermore, during summation, the prosecutor recounted how Tiffany identified defendant repeatedly on the night of the robbery. The prosecutor also stated: "Pete came back and said, Cotto was wearing those clothes down there. Nathan Cotto has on what [Tiffany] just described, and he's down at the Citizen's Club now."

### B.

Hearsay is an out-of-court statement that is offered for the truth of the matter asserted therein. *N.J.R.E.* 801(c). If an officer-witness testifies as to "what some other person told [the witness] concerning a crime by the accused[,] the testimony violates the hearsay rule" and the confrontation clause. *State v. Bankston*, 63 *N.J.* 263, 268–69, 307 *A.*2d 65 (1973) (citations omitted). However, we will disregard "[a]ny error or omission [by the trial court] ... unless it is of such a nature as to have been clearly capable of producing an unjust result." *R.* 2:10–2.

Because the prosecutor did not need to include the details of Pete Thomas's statement to establish why the police went to the Citizen's Club, the introduction of the details regarding Thomas's description of defendant bolstered the identification testimony, rather than clarified why the group went to the Citizen's Club. The questions posed by the prosecutor on redirect examination were objectionable because they constituted hearsay. When defense counsel objected, the trial court should have sustained his

objection. The description of the matching clothes inappropriately linked the description of the robber to defendant.

Although the prosecutor should not have been allowed to ask those questions based on out-of-court statements, in the overall context of the trial, we cannot conclude that those brief questions were "clearly capable of producing an unjust result." *See R.* 2:10-2. Because the State presented strong identification evidence to support its contention that defendant had committed the robbery, we do not believe that the jury reached a result that it would not have arrived at in the absence of the disputed testimony. In any event, it was defendant who originally introduced the suggestive testimony when, on cross-examination of Tina, he elicited testimony from her that "the description I gave" to Thomas caused the police to go to the Citizen's Club. Again, at sidebar, defense counsel specifically agreed that the prosecutor could "ask the question why did you go to the Citizen's Club." Only when the prosecutor used questions eliciting hearsay that included the clothing description did defense counsel object on redirect examination. Although there is no need for us to determine why counsel made that concession, we note that defendant asserted that he was at the Citizen's Club before the robbery occurred. Thus, the defense strategy may well have been that the State's redirect examination indicating that defendant was at the club would reinforce his alibi that he was there during the robbery. In any event, for all of the above reasons, we conclude that the error was harmless.[1]

Finally, although the prosecutor's statements in her summation regarding Thomas's observations of defendant at the Citi-

---

[1] We also note that after the oral argument in this matter, defendant filed a *pro se* brief, alleging that *Crawford v. Washington,* 541 *U.S.* 36, 124 *S.Ct.* 1354, 158 *L.Ed.*2d 177 (2004), bars the statements attributed to Peter Thomas. Defendant filed his late brief without permission of this Court. Moreover, although *Crawford, supra,* was decided on March 8, 2004, defendant's original brief to this Court, filed on April 21, 2004, does not discuss or even cite *Crawford, supra.* In any event, we deem defendant's *Crawford* claim to be without merit.

zen's Club may have bolstered the State's case against defendant, we apply the plain error standard because the defendant did not object. We hold that the use of that testimony during summation does not constitute plain error. Specifically, counsel agreed that the State could ask Tina why she and the police went to the Citizen's Club. Any prejudice defendant suffered did not have the capacity to deny defendant a fair trial, and we therefore affirm the conviction. *See State v. Swint,* 328 *N.J.Super.* 236, 261, 745 *A.*2d 570 (App.Div.2000) ("[P]rosecutorial misconduct is only grounds for reversal of a conviction if it was so egregious that it deprived defendant of a fair trial." (citing *State v. Feaster,* 156 *N.J.* 1, 59, 716 *A.*2d 395 (1998))).

## VI.

For the reasons discussed above, we affirm the judgment of the Appellate Division and uphold defendant's conviction.

*For affirmance*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE, and RIVERA–SOTO—7.

*Opposed*—None.