**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0692-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ANTHONY RECIOFIGUEROA,
a/k/a ANTHONY FIGUEROA,
ANTHONY R. FIGUEROA,
ANTHONY FIGUERORA,
ANTHONY RECIO, and
ANTHONY RICEO,

    Defendant-Appellant.

_____

Argued December 17, 2024 – Decided March 11, 2025

Before Judges Gilson, Bishop-Thompson, and Augostini.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 19-12-0794.

Lucas B. Slevin, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Lucas B. Slevin, of counsel and on the briefs).

Amanda G. Schwartz, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Amanda G. Schwartz, of counsel and on the brief).

PER CURIAM

On July 6, 2019, C.R. was shot and killed on a street in Elizabeth.[1] A jury convicted defendant Anthony Reciofigueroa of the first-degree murder of C.R., N.J.S.A. 2C:11-3(a)(1), (2). The jury also convicted defendant of two related weapons offenses: second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1). Defendant was sentenced to an aggregate prison term of fifty-five years, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. He appeals from his convictions and sentence.

The key issue at trial was the identity of the shooter. No witness who testified at trial saw the shooting. Moreover, the State never found the gun that was used to shoot the victim. Instead, the primary evidence against defendant was a series of fifty clips from surveillance videos, none of which captured the shooting. Rather, the videos were from surrounding areas. A detective described those videos in detail for the jury. During her testimony, the detective

---

[1] We use initials and fictitious names for the victims and witnesses to protect their privacy interests.

twice identified defendant as the person depicted in two of the video clips and essentially told the jury that defendant was the shooter. The detective also repeatedly described a car depicted in the videos as the car identified by witnesses who saw a car near the scene of the shooting.

Because the detective's narrations of the video clips were inadmissible opinion testimony, we reverse defendant's convictions. Those errors were compounded by the trial court's failure to instruct the jury on the defense of third-party guilt. Defendant had presented evidence that another person may have been the shooter, but the trial court failed to charge the jury on that defense. Given our reversal of defendant's convictions, we need not address the sentencing issues. Accordingly, we vacate the judgment of conviction and remand for a new trial.

I.

We discern the facts from the testimony and evidence presented at trial. Twenty witnesses testified on behalf of the State. None of those witnesses saw the shooting.

Two of the witnesses knew C.R. M.R. (Mark), C.R.'s brother, testified that on the evening of July 6, 2019, he was standing on the front steps of a building on East Jersey Street in Elizabeth, where he lived. C.R. approached

A-0692-22

the building, told Mark to go inside, and Mark did. Mark then heard gunshots, came back outside, and saw his brother lying on the ground. C.R. was later pronounced dead from gunshot wounds to his head.

Sometime after the shooting, a person known to Mark as "Al" sent him a photo of a car and indicated to Mark that the car was connected to the shooting. Mark, thereafter, gave the photo to a police detective investigating the shooting.

Q.E. (Quinn), who used to date Mark, was also on the steps of the building on the evening of the shooting. She testified that she was "sitting talking. Just doing regular stuff. And, I don't know, just some random guy walked down the block . . . and asked, like, [w]hy are you running? Why is everybody running? And then he just pulled a weapon out." So, Quinn ran into the building. When Quinn came back out, she saw C.R. "lying on the floor" and "the guy running down the street."

Quinn called 9-1-1 and described the shooter as "[B]lack." At trial, Quinn described the man as "African American or Hispanic" and stated that he was dressed in gray clothing with a hood on. She also testified that the shooter was wearing "Nike Air Force" sneakers. Quinn did not identify defendant as the man who came up to the steps of the building just before the shooting.

4

Three other witnesses were in the area of the shooting and heard gunshots. O.V. (Onna) testified that she lived on East Jersey Street about two and a half blocks from where the victim was found. She explained that she was standing in the doorway of her home when she heard gunshots and shortly thereafter saw a person running from East Jersey Street towards Sixth Street. She described the person as a "tall and skinny" man wearing all gray. She also explained that she could not see the man's face because his sweatshirt covered it, but she noticed "[he] had something in [his] hands and [he was] putting it in [his] sweater's pocket."

J.G. (Jessica) testified that she was at a supermarket with her mother, A.L. (Anne), and sister. While they were walking home, Jessica heard gunshots and about thirty seconds later she saw a man running by the intersection of East Jersey and Sixth Street. She described the man as wearing a gray hoodie, approximately five feet eight inches to five feet ten inches tall, with light skin, "[l]ike, tannish." She stated that the shooter got into a white car parked on Sixth Street.

Anne testified that she was returning home with her daughters when she heard gunshots. She then saw a person running and saw him put something in his pants pocket. In her initial statement and again at trial, Anne said that the

A-0692-22

person was wearing gray pants and a white shirt. Anne described the man's complexion as "light brown [in] color." Like Jessica, Anne stated that the man got into a white car.

A lieutenant with the prosecutor's office later located and interviewed "Al." Al's statement was played for the jury following a Gross hearing.[2] Al told the lieutenant that on July 6, 2019, he was hanging out with his girlfriend who lived on East Jersey Street. He left East Jersey Street in his car, which was a 2005 white Honda, to pay his barber. As he was returning, he made a right turn onto Sixth Street and heard "firecrackers or gunshots."

Al stated that he then saw an individual running with a hoodie on before getting into a "dark colored vehicle." Al thought the situation was suspicious, so he followed the car and tried to take a picture of its license plate, but the picture did not capture the license plate. Al explained that he stopped following the car when it "jumped on the highway." Al also stated that he was confident

---

[2] "[A] Gross hearing is the name given to the Rule 104 hearing that the trial court conducts to determine the admissibility of a witness's inconsistent out-of-court statement -- offered by the party calling that witness -- by assessing whether the statement is reliable." State v. Greene, 242 N.J. 530, 540 n.2 (2020) (first citing State v. Gross, 121 N.J. 1, 15-17 (1990); and then citing State v. Cabbell, 207 N.J. 311, 322 n.5 (2011)).

A-0692-22

that the car's license plate was not a New Jersey license plate, and he thought it might have looked "green maybe."

The State's theory at trial was that defendant was the shooter and that he had driven a black Chevy Malibu to and from the scene of the shooting. On July 26, 2019, a 2010 black Chevy Malibu with a Vermont license plate was stopped by a police officer for a traffic violation. That car was driven by D.P. (Dave). Dave was a Black male, approximately six feet and two inches tall, weighing 210 pounds.

On August 5, 2019, the same Chevy Malibu was pulled over by a police officer in Jersey City. Defendant was driving the Malibu.

At trial, the State called J.P. (Joe), who testified that in the spring or early summer of 2019, he had helped a woman and her boyfriend purchase a black Chevy Malibu in Vermont. Joe identified a photograph of defendant as the boyfriend. Joe also identified a photograph of Dave as resembling a man he helped to get the Malibu out of impoundment approximately a month or two after the car had been purchased.

Defendant's former girlfriend, R.M. (Ruth), also testified at trial. She identified a photo of a black Chevy Malibu as a vehicle defendant sometimes drove. Ruth was also shown several photographs depicting individuals. She

7

A-0692-22

described some of the photos as "blurry" and stated she could not make an identification. When asked if she could identify defendant in another photograph, she stated that one picture looked like defendant, but she was not sure because the individual's back was turned from the camera. Concerning other photographs, she stated that the person depicted "resembled" defendant, but she was not sure.

Lead Detective Sonia Rodriguez obtained over thirty videos from residential homes and commercial businesses in the area around the shooting scene on East Jersey Street and on streets leading to and from the New Jersey Turnpike. Rodriguez testified that she organized the video clips into what she believed was a chronological order depicting a "vehicle of interest" driving towards and away from the scene of the crime.

Through Rodriguez's testimony, the State presented fifty video clips. According to Rodriguez, these clips depicted the purported route of the vehicle of interest as reconstructed by the police using location and time stamps from the videos. As she described the videos to the jury, Rodriguez marked the location of each surveillance camera on a large poster-board map and outlined the route that she believed the shooter took based on her review of the videos.

8

As the videos were played for the jury, Rodriguez identified what she believed to be "the vehicle of interest which was the [Chevy] Malibu." Rodriguez repeatedly described the car seen in the video clips as the Chevy Malibu.

During her testimony, Rodriguez also twice identified a person sitting in the car or standing outside the car as defendant. Concerning one video clip, Exhibit S-12, Rodriguez told the jury that she was "able to see the defendant and [his girlfriend]." In describing another video clip, Exhibit S-38, Rodriguez told the jury that she believed the individual depicted was "[t]he defendant."

Defense counsel did not object to the testimony of Rodriguez or to the admission of the map showing the locations of the various surveillance cameras.

In closing argument, counsel for defendant pointed out that the witnesses who testified had described the man seen near the scene of the shooting in inconsistent ways and that their descriptions were vague. Defense counsel emphasized that the State did not offer any testimony that identified the man at the scene of the shooting as defendant. He pointed out that there was no evidence of a motive, and the State had not found the weapon used in the shooting. Defense counsel also contended that the description of the suspected shooter was more consistent with Dave and that there had been testimony

9

establishing that Dave had access to and had driven the Chevy Malibu. Defense counsel did not, however, ask for a jury instruction on the defense of the third-party guilt of Dave.

The jury convicted defendant of the first-degree murder of C.R., second-degree possession of a weapon for an unlawful purpose, and second-degree unlawful possession of a handgun. On the murder conviction, defendant was sentenced to fifty-five years in prison, with periods of parole ineligibility and parole supervision as prescribed by NERA. He was also sentenced to a concurrent term of eight years in prison for the conviction for unlawful possession of a handgun. The conviction for possession of a weapon for an unlawful purpose was merged with the murder conviction. Defendant now appeals from his convictions and sentence.

## II.

On appeal, defendant makes four arguments. Three of those arguments challenge his convictions based on the detective's narration of the video clips and the trial court's failure to charge the jury on the defense of the third-party guilt of Dave. The last argument challenges defendant's sentence on several grounds. Specifically, defendant articulates his arguments as follows:

A-0692-22

POINT I – DEFENDANT'S CONVICTIONS MUST BE REVERSED BECAUSE THE DETECTIVE IMPROPERLY NARRATED VIDEO FOOTAGE BY (A) DESCRIBING EVENTS ON VIDEO OF WHICH SHE HAD NO FIRSTHAND KNOWLEDGE, (B) DESCRIBING THE PATH OF TRAVEL TAKEN BY THE SUSPECT, AND (C) IDENTIFYING THE DEFENDANT ON VIDEO.

A.    The Detective Improperly Identified The Shooter And Described Him Exiting The Vehicle Of Interest.

B.    The Detective Improperly Identified The Suspect's Path Of Travel, And Created A Map Illustrating Her Belief As To The Path Of Travel.

C.    The Detective Improperly Identified The Defendant On Video.

POINT II – THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING TO INSTRUCT THE JURY ON THIRD-PARTY GUILT.

POINT III – THE CUMULATIVE IMPACT OF THE DETECTIVE'S IMPROPER VIDEO NARRATION TESTIMONY COMPOUNDED BY THE LACK OF PROPER JURY INSTRUCTION DENIED DEFENDANT DUE PROCESS AND A FAIR TRIAL.

POINT IV – RESENTENCING IS REQUIRED BECAUSE THE COURT IMPROPERLY CONSIDERED DEFENDANT'S EXERCISE OF HIS RIGHT AGAINST INCRIMINATION, AND ACCORDED INSUFFICIENT WEIGHT TO YOUTH AS A MITIGATING FACTOR.

11

A. The Sentencing Court Improperly Considered Defendant's Exercise Of His Right Against Self-Incrimination As Contributing Substantial Weight To Aggravating Factor Three.

B. The Sentencing Court Did Not Accord Appropriate Weight To Mitigating Factor Fourteen, Resulting In An Excessive Sentence.

Having reviewed defendant's arguments in light of the evidence at trial and the governing law, we hold that three of the arguments require a reversal of his convictions and a remand for a new trial. The first ground warranting a reversal was the improper narration of the video clips by a detective who had no firsthand knowledge of the shooting, but nonetheless identified defendant, the car allegedly driven by defendant, and the route defendant allegedly drove to and from the scene of the shooting.

The second ground warranting a reversal was the trial court's failure to instruct the jury on the defense of third-party guilt. Defendant presented evidence that Dave could have been the person driving the Chevy Malibu and that he may have been the shooter. That evidence should have caused the trial court to charge the jury on the defense of third-party guilt.

While defense counsel failed to object to the testimony of the detective and failed to request a third-party guilt charge, the trial court's failure to exclude the detective's testimony and give the charge constituted plain errors. See R.

12

2:10-2. Moreover, in combination, we are convinced that the cumulative effects of those errors deprived defendant of a fair trial.

A.    The Narrations of the Video Evidence.

The New Jersey Supreme Court has established rules governing what is and is not permissible when a witness narrates video evidence of events the witness did not observe in real time. See State v. Watson, 254 N.J. 558, 600-02 (2023); State v. Singh, 245 N.J. 1, 17-20 (2021). The Court has explained "that Rules 701, 602, and 403 in tandem provide the proper framework to assess video narration evidence by a witness who did not observe events in real time." Watson, 254 N.J. at 600.

The Court then set forth four principles to guide the admission of narrative testimony concerning video evidence by an investigating law enforcement officer. In that regard, the Court explained:

> First, neither the rules of evidence nor the case law contemplates continuous commentary during a video by an investigator whose knowledge is based only on viewing the recording. To avoid running commentary, counsel must ask focused questions designed to elicit specific, helpful responses. "What do you see?" as an introductory question misses the mark.
>
> Second, investigators can describe what appears on a recording but may not offer opinions about the content. In other words, they can present objective, factual comments, but not subjective interpretations. . . .

A-0692-22

Third, investigators may not offer their views on factual issues that are reasonably disputed. Those issues are for the jury to decide. So a witness cannot testify that a video shows a certain act when the opposing party reasonably contends that it does not. . . .

Fourth, although lay witnesses generally may offer opinion testimony under Rule 701 based on inferences, investigators should not comment on what is depicted in a video based on inferences or deductions, including any drawn from other evidence.

[Id. at 603-04 (citations omitted).]

In giving specific examples, the Court also explained that an investigator cannot say "that's the defendant," if that fact is disputed, while describing video evidence to a jury. Id. at 604 (internal quotation marks omitted).

Applying these principles to defendant's trial, Detective Rodriguez's testimony violated Rules 701, 602, and 403 in two ways. First, she identified defendant as the person depicted in the video clips. Second, she gave extensive comments on the route defendant allegedly drove the Chevy Malibu to and from the scene of the shooting.

Detective Rodriguez did not observe the shooting, the shooter, or the Chevy Malibu. Accordingly, she lacked firsthand knowledge of the event, and her testimony was based primarily on her review of the video clips.

14

During her testimony, Rodriguez twice identified defendant as the person depicted in certain video clips. The detective was shown a video clip from 705 Third Avenue, which had been marked as Exhibit S-12. She was then asked to explain the purpose of why that video clip was being displayed. Rodriguez responded: "The video was - - we conducted more video search and we noticed in this video that we were able to see the defendant and [his girlfriend]."

Thereafter, the detective was asked to describe a video clip taken from East Jersey Street, which was marked as Exhibit S-38. The video clip was played for the jury, and the detective was asked to stop the video clip when there was something she wanted to point out to the jury. The detective then asked for the video clip to be stopped, and she was asked to explain to the jury "what exactly it was [she] [was] pointing to." The detective pointed to the video clip, and she was asked, "[w]ho do you believe that to be?" The detective responded: "The defendant."

The trial court immediately interrupted the testimony and gave the jury an instruction concerning the detective's testimony. In that regard, the court told the jury:

> You just heard the detective's opinion as the person who's worked on the case. Ladies and gentlemen, whether or not that is or is not the defendant is a question for you to answer. That's something that you

have to decide independently yourself based upon all information that is presented in this case.

The detective's testimony identifying defendant was inadmissible opinion testimony without a factual basis. In that regard, the detective's testimony violated the third and fourth principles set forth in Watson, 254 N.J. at 603-04. Whether the video clips depicted defendant was clearly a disputed issue at trial. Thus, that issue was for the jury to decide, and the detective's testimony was highly prejudicial and without a factual basis. See N.J.R.E. 403. Moreover, the detective's testimony was based on a series of inferences, including inferences apparently drawn from the detective's investigation of the shooting and murder.

Furthermore, the detective's testimony identifying defendant in two video clips clearly suggested to the jury that defendant was the person in the car in all the video clips presented through her testimony. In that regard, in describing other video clips to the jury, the detective offered her opinion concerning an individual who she described as "the shooter."

The trial court's instruction to the jury following one of the identifications did not cure the problem. Indeed, that instruction was a further error because it suggested that the detective's testimony was admissible and should be considered by the jury. Without striking the testimony, the jury was left with

16

the impression that they could consider the detective's opinion, but they would have to make up their own mind as to whether it was persuasive.

Detective Rodriguez also violated the principles set forth in Watson by identifying for the jury the type of car depicted in the video clips and the route the car took. She repeatedly identified a car seen in various video clips as the vehicle of interest. At other points, she identified that vehicle as a Chevy Malibu. The detective, however, had no basis for that testimony other than her review of the video clips.

"[A] trial court's evidentiary rulings are entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment." Singh, 245 N.J. at 12-13 (alteration in original) (quoting State v. Nantambu, 221 N.J. 390, 402 (2015)). Moreover, when there is no objection to an alleged error at trial, the issue is reviewed for plain error. Id. at 13 (first citing R. 2:10-2; and then citing State v. Camacho, 218 N.J. 533, 554 (2014)). Under the plain error standard, we reverse if the error is "clearly capable of producing an unjust result." State v. Rose, 206 N.J. 141, 157 (2011) (quoting R. 2:10-2) (internal quotation marks omitted).

The admission of the detective's testimony was an abuse of discretion and a plain error. Whether defendant was the person who shot C.R. was the critical

17

issue at trial. There was no eyewitness testimony to the shooting and there was no physical evidence linking defendant to the shooting. Additionally, the State did not recover the gun used in the shooting or offer evidence directly linking defendant to the possession of a weapon at the time of the shooting. Instead, all the evidence was circumstantial and primarily based on the inadmissible opinion testimony of Detective Rodriguez.

B. The Defense of Third-Party Guilt.

Defendant contends that the trial court erred by not providing the jury with an instruction on his defense of third-party guilt. Defense counsel, however, did not request that jury instruction. Accordingly, we review this issue for plain error. See R. 2:10-2.

Trial courts have an independent responsibility to provide complete jury instructions, even when specific instructions are not requested. State v. Reddish, 181 N.J. 553, 613 (2004) ("It is the independent duty of the court to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party."). Accordingly, incomplete charges can warrant a reversal. State v. Collier, 90 N.J. 117, 122-23 (1982).

"In the context of jury instructions, plain error is '[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" Camacho, 218 N.J. at 554 (alteration in original) (quoting State v. Adams, 194 N.J. 186, 207 (2008)) (internal quotation marks omitted). In addition, the error should be evaluated "in light 'of the overall strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).

As already noted, the key issue at trial was the identification of the shooter. One of the primary ways the State tried to prove that defendant was the shooter was evidence that defendant had driven a black Chevy Malibu, which the State contended the shooter used to travel to and from the scene of the shooting. There was also evidence, however, that Dave had previously driven and had access to the Chevy Malibu in July 2019. Accordingly, in his closing argument, defense counsel emphasized that Dave might have been the shooter because he could have been the person driving the Chevy Malibu. Defense counsel also argued that several witnesses described the shooter as "[B]lack" or

"African American" and pointed out that Dave is Black. Defendant, in contrast, is Hispanic.

As part of its case, the State disputed that Dave was the shooter. Lead Detective Rodriguez was specifically asked about Dave, and she testified that her superiors had decided not to interview him. The State also disputed that the witnesses' descriptions of the shooter matched Dave.

Given that the evidence against defendant was circumstantial, we hold that it was plain error not to have charged the jury on the defense of third-party guilt concerning Dave. While defense counsel should have requested that charge, defense counsel's arguments in closing and the State's effort to rebut the third-party guilt of Dave made that issue clear enough that it was incumbent on the trial court to provide the jury instruction.

The State cites to State v. Cotto to argue that the jury was properly charged to determine whether defendant was responsible for C.R.'s death. See 182 N.J. 316 (2005). In Cotto, our Supreme Court found that although identification was a "key issue" at trial, the trial court did not commit plain error in failing to provide a detailed identification instruction. Id. at 325-27. Initially, we note that the identification instruction discussed in Cotto differs from the third-party guilt charge involved in this matter. More significantly, however, the Court in

<u>Cotto</u> relied on "the strength and quality" of the State's overall evidence in concluding that the jury instructions were adequate. <u>Id.</u> at 327.

In this case, in contrast, there was no eyewitness to the shooting and the witnesses who saw a person running after the shooting provided conflicting descriptions of that person. So, overall, the State did not present a strong enough case against defendant to alleviate the need for a third-party guilt charge.

C.     The Cumulative Impact of the Errors.

As we have detailed, the narrations of the video clips by Detective Rodriguez, and particularly the identification of defendant during those narrations, constituted reversible error. The plain error concerning the trial court's failure to give an instruction on the defense of third-party guilt is a closer call. <u>See</u> <u>ibid.</u>

Cumulatively, however, the two errors warrant a new trial. "[E]ven when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal." <u>State v. Jenewicz</u>, 193 N.J. 440, 473 (2008). Moreover, "the predicate for relief for cumulative error must be that the probable effect of the cumulative error was to render the underlying trial unfair." <u>State</u>

21

v. Burney, 255 N.J. 1, 29 (2023) (quoting State v. Wakefield, 190 N.J. 397, 538 (2007)) (internal quotation marks omitted).

As we have already pointed out, the identity of the shooter was the key issue at trial. The State's evidence as to the shooter, however, was far from overwhelming. Consequently, the cumulative errors of admitting Detective Rodriguez's video narrations and failing to give a jury instruction on the defense of third-party guilt demonstrate that defendant was not accorded a fair trial.

## III.

We, therefore, reverse defendant's convictions and vacate the judgment of conviction. Given that holding, we need not address the sentencing issues. This matter is remanded for a new trial or further proceedings.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

A-0692-22