911 A.2d 88 (2006)
389 N.J. Super. 70
Ismael NEGRON, Plaintiff-Respondent,
v.
MELCHIORRE, INC., t/a Eugene's Bar, Eugene Melchiorre, Eugene's Enterprises, Inc., Defendants-Appellants, and
Ledaro Stokes, Defendant-Respondent.
Carlos Lucena, Plaintiff-Respondent,
v.
Melchiorre, Inc., t/a Eugene's Tavern, Eugene Melchiorre, Eugene's Enterprises, Inc., Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued September 27, 2006.
Decided December 1, 2006.
*90 Elizabeth A. Wilson, argued the cause for appellants (Bolan Jahnsen Reardon, attorneys, Shrewsbury; Ms. Wilson, on the brief).
Darrell Fineman, Vineland, argued the cause for respondent Ismael Negron (Capizola Fineman & Lapham, attorneys; Mr. Fineman, on the brief).
Gerard W. Quinn, Atlantic City, argued the cause for respondent Ledaro Stokes (Cooper Levenson April Niedelman & Wagenheim, attorneys; Mr. Quinn, on the brief).
Daniel E. Rosner, for respondent Carlos Lucena, on the letter relying on the brief filed on behalf of respondent Ismael Negron.
Before Judges CUFF, FUENTES and MESSANO.
The opinion of the court was delivered by
FUENTES, J.A.D.
Among the legal questions raised by the parties in this appeal, is an issue of first impression in this State. Namely, whether a party who files an offer of settlement for a specified amount pursuant to the Offer of Judgment Rule, Rule 4:58 ("Rule"),[1] is entitled to recover from the *91 party not accepting the offer, the sanctions available under Rule 4:58-2, when: (1) defendant did not accept plaintiff's offer within ninety days of its service; (2) the first trial in the underlying litigation was nullified as a mistrial; (3) the jury's verdict in a second trial was set aside by the trial court; (4) a final judgment in plaintiff's favor, awarding him damages greater than 120% of his offer of settlement was not entered until the completion of a third trial; and (5) the initial offer of settlement was not reaffirmed after the first mistrial, or at any time thereafter.
Pursuant to Rule 4:58-2, the trial court held that plaintiff was entitled to recover from defendant all counsel fees incurred in connection with the prosecution of the case following the non-acceptance, including those associated with the second and third trials; enhanced prejudgment interest; and litigation costs. The court reasoned that nothing in the provisions of the Rule rendered the original offer of judgment ineffective or otherwise unenforceable, merely because the first trial resulted in a mistrial. We agree and affirm.
We now hold that the sanctions provided in Rule 4:58-2 are enforceable against the party who fails to accept an offer of judgment "prior to the 10th day before the actual trial date or within 90 days of its service, whichever period first expires," Rule 4:58-1, even if the first trial results in a mistrial. The only requirement for the enforceability of these sanctions is the entry of a final judgment disposing of the case. Rule 4:58-5. It matters not whether the final judgment was entered after the completion of one trial, or, as here, after the completion of the third trial.
The salutary public policy underpinning the Offer of Judgment of Rule is to promote the early settlement of civil disputes. A key aspect of this policy, is the availability of sanctions against the party who fails to accept an offer of settlement that, after the entry of a final judgment, falls within a certain range of the jury's verdict, as established by the Rule. Stated differently, the vitality of the Rule depends upon holding the party who declines to accept an offer of settlement liable for the consequences that flow directly from this strategic decision. Under Rule 4:58-2, those consequences include awarding the party making the offer of settlement counsel fees, enhanced prejudgment interest, and litigation costs, commencing on the date the offer is no longer legally capable of being accepted, until a final judgment is entered in favor of the offeror, regardless of whether it takes multiple trials to reach this outcome.
As part of this appeal, defendant, Eugene's Tavern ("Tavern") also argues that: (1) the jury verdict rendered after the third trial is tainted, requiring a new trial on both liability and damages; (2) the trial court erred in precluding the testimony of a police officer witness concerning statements made to him by an individual who allegedly identified defendant Stokes as Ismael Negron's assailant; (3) the trial court erred in refusing to charge the jury on intervening and superseding causes; and (4) the trial court should have granted its motion for remittitur. After a careful review of the record, and applying prevailing legal standards, we reject these arguments. We are satisfied that the arguments reflected in (3) and (4) lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).
*92 All of the issues identified here come before us in the context of a lawsuit filed by plaintiff Ismael Negron against Eugene's Tavern, in connection with injuries Negron sustained in an altercation that occurred in the parking lot of Eugene's Tavern. A proper examination of these issues requires a recitation of the case's unusual procedural history, and the salient facts.

I

Procedural History
Negron's civil complaint against defendant Eugene's Tavern included a count alleging negligent supervision of the parking lot servicing the bar. The complaint also named Ledaro Stokes as the individual who struck Negron from behind with a bottle. Negron's companion Carlos Lucena filed his own complaint against Eugene's Tavern. The two cases were consolidated for trial purposes.
The matter first came for trial on May 12, 2003. This first trial ended without a verdict. The judge presiding over the proceedings declared a mistrial after noticing that several jurors had fallen asleep during the presentation of videotaped testimony. Neither party sought interlocutory appellate review of this decision.
The second trial began on October 25, 2004, and concluded on November 4, 2004, with a jury verdict finding defendant, Eugene's Tavern, liable for Negron's injuries. The same jury found that Stokes had not assaulted Negron. As to damages, the jury awarded Negron $28,269.35 for medical costs incurred in the treatment of his injuries, and $5,877.02 for lost wages proximately caused by the incident. The jury did not award any damages for "pain and suffering." The jury also found Eugene's Tavern liable for the injuries sustained by Lucena, but again did not award any monetary compensation for pain and suffering.
Immediately following this verdict, both Negron and Lucena moved for a new trial, arguing that the damage awards were indicative of a tainted, compromise verdict. The trial court granted plaintiffs' motion, and ordered a new trial on the issues of liability and damages as to defendant Eugene's Tavern. The court upheld the jury's verdict in favor of Stokes.
The matter reached trial for the third time on March 16, 2005. In this final trial, the jury found Eugene's Tavern negligent. Unlike in the previous trial, this jury was permitted to consider the possible comparative negligence of both Lucena and Negron. Equipped with this analytical tool, the jury found Lucena 35% liable and Eugene's Tavern 65% liable.
With respect to Negron, the jury found Eugene's Tavern 100% liable, and awarded him the sum of $1 million in damages for pain, suffering, disability, impairment and loss of enjoyment of life, medical expenses in the amount of $28,269.35, and lost wages in the amount of $5,841.02.
Thereafter, Eugene's Tavern moved for a new trial or remittitur. The court denied these motions, and entered judgment in favor of Lucena in the amount of $5,272.99. The court also entered judgment in favor of Negron in the amount of $1,429,218.24. This judgment included costs and counsel fees in the amount of $48,884 as a result of the trial court finding that the offer of judgment filed on behalf of Negron in December 2002, remained effective through the 2005 trial.

II

The Facts

A
Eugene's Tavern, located in the City of Vineland, is a social establishment licensed *93 to dispense alcoholic beverages to the public. The Tavern has the capacity to seat a maximum of 140 people, and has approximately 100 parking spaces in an adjacent lot. On the evening of March 19, 1999, the Tavern was sponsoring an event called "Latin Night." This was a particularly popular weekly event that attracted a large number of patrons. On this particular night, despite the fact that the Tavern was very crowded, there were only two security guards on duty. Several witnesses in attendance characterized the parking lot as being quite rowdy, with people arguing and screaming.
Among those in attendance on the night of March 19, 1999, were plaintiffs Ismael Negron and Carlos Lucena. They were there with two other men. In the early morning hours of March 20, 1999, Negron and Lucena left the Tavern and headed for the parking lot to wait for another member of their party to join them. Contemporaneously, a large number of unruly persons had begun to gather in the Tavern's parking lot.
As both Negron and Lucena sat in the car, an unidentified individual walked in front of the vehicle, and began banging on the hood with his fist and shouting obscenities. Lucena first sounded the car's horn, and then got out of the car to confront this man. Almost immediately after leaving his car, Lucena was struck by another person. Although the precise details of what occurred next are disputed, the record is clear that Negron exited from the passenger side of the car with the intention of helping Lucena.[2]
Ledaro Stokes was also a patron at Eugene's Tavern on the night of March 19, 1999. He testified that he observed only two security guards at the door when he arrived. Stokes described the bar as being "packed," with approximately 150 to 200 people inside. He left the Tavern at around 2:00 a.m., after last call. He did not see any security guards in the parking lot. As he walked to his car, Stokes saw the altercation between Lucena and the unknown assailants. As he approached Lucena to urge him to return to his car, he saw Lucena get struck from behind, ultimately being attacked by six or seven other individuals. Stokes also saw Negron get out of the car, and then get immediately attacked from behind. There were no security guards in the parking lot while this violence was unfolding.

B
When the police arrived at the scene, they found Negron lying on the pavement. He was unresponsive, unconscious, and bleeding from the ears and the back of his head. He was immediately taken by ambulance to the Trauma Center at Cooper Hospital, where he was examined by several physicians, including a neurologist, a neuro-psychologist and an otolaryngologist.
Dr. Andrea J. Casher, Psy.D., examined Negron soon after his arrival at the hospital. Dr. Casher, one of only three hundred neuro-psychologists practicing in this discipline, described her specialty as a branch of psychology that focuses on brain functions and its relationship to functionality. Initially, she diagnosed Negron as suffering from a subdural hematoma (bleeding into the brain). Negron was unable to breathe on his own when he first arrived at the hospital. The injuries he sustained occur when the brain is jostled and bounces against protrusions in the skull in the area of the temporal lobe. In this case, Negron's injuries were caused *94 when he was hit in the head, and again when his head struck the ground. Dr. Casher testified that Negron was "significantly cognitively impaired," also noting the advent of a sustained post-traumatic amnesia.
Both Negron and his wife reported that he continued to suffer from daily headaches, gait disturbance, decreased hearing, abrupt onset of anger, irritability, fatigue, inactivity and forgetfulness. According to Dr. Casher, as of April 1999, Negron had suffered a significant injury, rendering him unable to return to work at that time. Dr. Casher recommended cognitive rehabilitation and provided a daily schedule of activities for Negron to follow.
On April 25, 2001, Dr. Casher saw Negron for a follow-up appointment. Both Negron and his wife stated that he still suffered from fatigue and forgetfulness, and that he was unable to perform more than one task at a time. Dr. Casher ordered several tests which eventually revealed that Negron's processing was slow; that he had difficulties with dexterity and speed; and that he had difficulty with executive functioning, the part of the brain that allows an individual to formulate and carry out plans in an organized manner. Dr. Casher ultimately concluded that Negron's injuries were permanent and that he had reached a maximum plateau of recovery. She expressed surprise that Negron was able to return to work and opined that it was only because he had established and learned a fixed routine.
Eric D. Kramer, M.D., also examined and treated Negron. Kramer is a board certified neurologist, who headed the Neurology Division at Cooper Trauma Center at the time Negron was a patient there. He examined Negron on June 29, 1999. Dr. Kramer noted that Negron had suffered a skull fracture, decreased hearing on the left side, and nystagmus affecting the way he moved his eye. He diagnosed Negron as suffering from post-concussion syndrome, which is a derangement in the way the brain uses serotonin. This condition can cause memory problems, fatigue, depression, as well as sleep and emotional problems.
Dr. Dean Drezner, M.D., a board certified otolaryngologist,[3] also examined Negron after the assault. He explained that Negron's fracture included the temporal bone of the ear, and that this injury caused conductive hearing loss in his left ear. He described this condition as follows:
In just sitting around listening, the left ear would be extremely muffled. It would be worse than as if you had cotton stuffed in your ear. If you would stuff your ear canal with cotton, that will give you about a 20 decibel hearing loss and his is approximately 30 decibels. Which means in day-to-day conversation with people, especially when there is normal extraneous noise of other people talking, he would have a lot of difficulty. . . .
The evidence suggests that the effects of these injuries have been profound. Negron and his wife gave detailed accounts of the changes in their lives since his assault. Mrs. Negron stated that when she first visited her husband in the hospital, he was unconscious. It was not until the third day that he awakened. On that day, however, he did not recognize her or his daughter, and continued to have difficulty remembering the names of family members and friends who visited him while he was in the hospital.
*95 Mrs. Negron stayed home in order to care for her husband after he was released from the hospital. She explained that although they were told that he should receive cognitive therapy, it was not covered by their insurance, and they could not afford to pay for it out-of-pocket. Negron lacked energy, slept constantly, and complained of persistent headaches.
Prior to his injuries, Mrs. Negron characterized her husband as an extremely active man. He participated in VFW events, assisted with local fundraisers and family dances, and spent time with his family and friends. Now, he lacks the energy or desire to do any of these things. With respect to his relationship with his immediate family, he is no longer as close to his daughter as he once was. He and his wife are no longer sexually intimate due to his injuries.

C
The violent incident of March 20, 1999, was not an isolated occurrence in the history of Eugene's Tavern. According to the Tavern's chief of security, Pierre Vargas,[4] there had been previous security issues at the bar prior to the night the plaintiffs were injured. He gave the following description of prior problems at the Tavern:
Drunk people banging into people's cars. People coming from the street coming into the parking lot. Having to tell them the bar is closed, ain't nobody else coming. People that are just  you know, again confrontations from people getting out of cars  yo, what are you doing? Arguing with each other, stuff like that. People coming out or something like an argument that might have started in the bar but nothing happened in the bar, but it ended out in the parking lot because they were parked next to each other. You get a couple of drunks in, I start looking at you, you start looking at me, you slap the hell out of somebody, and there is a ruckus out there.
Based on this history, Vargas had recommended to the Tavern's owner, Eugene Melchiorre, to increase security at the bar, because there were times when Vargas believed that there were not enough security personnel to control the crowd in the parking lot.
Melchiorre testified that he delegated the security decisions to Vargas. In his deposition testimony, Melchiorre indicated that he was not aware of any prior problems in the parking lot. By contrast, Melchiorre admitted in his trial testimony that, due to fights in the parking lot, he had called the police on at least one occasion. According to Melchiorre, it was the Tavern's policy to have three security personnel working every evening. The security staff was instructed to make sure that everyone was out of the bar by 2:00 a.m. One guard was assigned to monitor the flow of patrons exiting the Tavern. The other two were deployed in the parking lot.

III

Compromise Verdict
In setting aside the jury's verdict in the second trial, the court determined that the jury had awarded grossly inadequate compensatory damages to Negron and Lucena, because of the court's ruling denying defendant's request to charge comparative negligence. Specifically, the jury was not permitted to consider Negron's and Lucena's conduct in exiting the car, as those facts bore on the question of their comparative fault in bringing about this incident. In the trial court's view, this required a *96 new trial for Negron and Lucena. The court concluded, however, that this verdict did not taint the jury's finding that Stokes had not been Negron's assailant. The court reached this conclusion based on the contents of the following note, which was sent out by the jury in the course of its deliberations:
Five of us feel a partial negligence is on Melchiorre while three[5] feel he, owner, has no responsibility as anyone who gets out of their car is asking for it and solely responsible for getting hurt because of a poor decision. Question 3, Mr. Stokes, decision. No. Vote 8-0.

[Emphasis added.]
Thus, in light of the jury's determination finding by a vote of eight to zero in favor of Stokes, the court concluded that a new trial should be limited to the claims asserted by Negron and Lucena. The following statements made by the trial judge encapsulate the court's reasoning in this regard.
THE COURT: Well, it's a whole  interesting case. First, the history of this case is interesting because the  first, we had the sleeping juror, so that case didn't go any where and that's how I inherited it to try it the second time and now maybe it  maybe we have a sleeping Judge because of a  the, you know, ruling that I made that sort of put us in this dilemma. I think I was right, but it's interesting, . . . [defense counsel] wanted the issue of comparative negligence on the part of the plaintiffs to go to the jury[,] and I took the position that the plaintiffs simply getting out of their car when they [] found themselves in this situation wasn't such that I believed that comparative negligence was proper, that there was no indication that they became aggressive either the plaintiffs became aggressive and that  and I don't know that I articulated it this way back then, but the  that maybe the lack of wisdom or their getting outside their car . . . that in and of itself was not comparative negligence and I wouldn't let it go to the jury.
You know, perhaps if I did, the jury might have put some . . . minor percentage of comparative negligence against them and dealt with this issue in a different fashion. Of course, on the other side of the coin, in light of the note we got back, . . . the jury may have felt that their negligence was greater simply by this act of getting out of the car, which I refuse to let go to the jury. It's just kind of interesting. It sounds like what would have happened if that question had gone forward. It might have been a 90/10 percent verdict and they would have then dealt with the issue of damages or it might have been 60 percent against the plaintiffs and, who knows?
Eugene's Tavern now argues that the trial court erred in upholding the jury's verdict in favor of Stokes. We disagree. The scope of a new trial ordered pursuant to Rule 4:49-1 "depends on the nature of the injustice." Fertile v. St. Michael's Med. Ctr., 169 N.J. 481, 490, 779 A.2d 1078 (2001). The court must thoroughly review the record in order to identify the discrete issues that have been affected by the tainted verdict. Where the error is clearly confined to certain issues, "the best interests of justice will be served by granting a partial new trial." Corridon v. City of Bayonne, 129 N.J.Super. 393, 398, 324 A.2d 42 (App.Div.1974). Conversely, if the error infecting one issue has also tainted the entire verdict, a new trial *97 encompassing all issues must be ordered. See Geler v. Akawie, 358 N.J.Super. 437, 472, 818 A.2d 402 (App.Div.), certif. denied, 177 N.J. 223, 827 A.2d 290 (2003).
Here, the taint was clearly limited to the claims raised by Negron and Lucena. The jury's note reflects only the concerns the deliberating jurors had about Negron's and Lucena's conduct in exiting the car. The five-to-three split related directly to the strongly held sentiments of some of the jurors that plaintiffs' foolish decision to abandon the safety of their car, purposefully placing themselves in harm's way, should be viewed as a contributing factor in their analysis of the Tavern's fault.
By contrast, the note also reflects the jury's unanimous determination that Stokes had not been Negron's assailant. Confronted with such a clear line of demarcation between the tainted result and the legally sustainable verdict, the trial court correctly limited the third trial to the claims raised by Negron and Lucena. The verdict exonerating Stokes was not affected, because the comparative negligence issue is not implicated in the analysis of the claims against him. See Dahle v. Goodheer, 38 N.J.Super. 210, 219, 118 A.2d 547 (App.Div.1955), certif. denied, 20 N.J. 534, 120 A.2d 661 (1956). The verdict is also amply supported by the evidence.

IV

Preclusion of Hearsay Testimony
Eugene's Tavern also argues that the trial court erred in excluding certain statements implicating Stokes as Negron's assailant. These statements were allegedly made by a female bystander to a police officer who had responded to the scene. Defendant argues that these statements should have been admitted as exceptions to the bar against hearsay testimony under N.J.R.E. 803(c)(2), (excited utterance), or N.J.R.E. 803(c)(1), (present sense impression). We reject these arguments.
We begin our analysis by briefly reciting the relevant facts concerning this issue. The trial court first considered the admissibility of the testimony at issue at a N.J.R.E. 104 hearing outside the presence of the jury. At this hearing, City of Vineland Police Officer Joseph Pagano testified that approximately twenty-five minutes after arriving at the scene of the incident, a woman approached him and told him that she had observed an African American man arguing with Negron immediately after Negron got out of his car. The man then pushed Negron in the chest area, and struck him on the head with a glass bottle. She described the assailant as being right-handed, wearing white pants and a yellow jacket.
Pagano described the woman's demeanor as "excited." She "just wanted to tell [me] what happened." After this brief encounter at the scene, Pagano asked the woman to go to the police station and give a formal statement memorializing her observations. Pagano gave the following description of what transpired at the police station:
A. When I got back to the station, [the woman] was at the front desk awaiting my arrival. And when I got there, she immediately came up to me and start[ed] pointing at a gentleman who was sitting in the lobby saying that's him, that's the  I was telling you about.
Q. Did you identify the person that was sitting in the lobby?
A. Yeah, it was a Ledaro.
Q. And did you identify Mr. Stokes through identification through him? Did he identify himself to you? Excuse me.
A. Yes.
* * * *

*98 Q. What was [the woman's] mood when she pointed out the person in the yellow jacket and white pants?
A. She was very excited when she came up to me that this was the individual that she was talking about.
Against this factual backdrop, Judge Curio denied defendant's application to admit Pagano's account of what the woman told him. We agree with Judge Curio's disposition of this evidentiary issue.
The excited utterance exception to the hearsay rule allows a court the power to admit certain out-of-court statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition and without opportunity to deliberate or fabricate." N.J.R.E. 803(c)(2). In order for the exception to apply, the court must be satisfied that the statement was an uncontrolled response from shock before reflection would allow the statement to be fabricated or influenced by self-interest. State v. Long, 173 N.J. 138, 158, 801 A.2d 221 (2002); Cestero v. Ferrara, 57 N.J. 497, 504, 273 A.2d 761 (1971). When deciding whether there was an opportunity to fabricate or deliberate, "a court should consider the element of time, the circumstances of the incident, the mental and physical condition of the declarant, and the nature of the utterance." Long, supra, 173 N.J. at 159, 801 A.2d 221 (quoting State v. Williams, 106 N.J.Super. 170, 172, 254 A.2d 538 (App.Div.), certif. denied, 55 N.J. 78, 259 A.2d 228 (1969), cert. denied, 397 U.S. 1057, 90 S.Ct. 1405, 25 L.Ed.2d 675 (1970)).
Our Supreme Court recently evaluated the excited utterance exception in two cases: State v. Branch, 182 N.J. 338, 865 A.2d 673 (2005), and State v. Cotto, 182 N.J. 316, 865 A.2d 660 (2005). In Branch, the Court analyzed the history of the excited utterance exception, and discussed, with concern, the continual broadening of the rule. Branch, supra, 182 N.J. at 364-65, 865 A.2d 673. A review of these cases makes it clear that an excited utterance claim should be rejected when the declarant has had the opportunity to deliberate or fabricate the testimony. Cotto, supra, 182 N.J. at 328, 865 A.2d 660. Thus, a court is not required to find that the witness actually fabricated the statement, or otherwise discussed or deliberated with others about what he or she observed. The court must reject the proffered statement, if it finds, from the circumstances presented, that the absent declarant merely had the opportunity to deliberate or fabricate before speaking to the police officer. Ibid.
Here, there is no question that the woman had the opportunity to fabricate or deliberate before she spoke with Pagano at the scene of the incident, and later at the police station. By his own account, Pagano had been at the scene for approximately twenty-five minutes before the woman approached him. We can reasonably surmise that it may have taken the police ten or fifteen minutes to respond to the call. Under these circumstances, the woman, who was part of the large crowd that had gathered in the parking lot, had the opportunity to deliberate and discuss what she had allegedly seen, with an unknown number of people, for approximately forty minutes.
Eugene's Tavern next argues that the statements at issue here were admissible under N.J.R.E. 803(c)(1). We again disagree. This rule of evidence provides that "a statement of observation, description or explanation of an event or condition made while or immediately after the declarant was perceiving the event or condition and without opportunity to deliberate *99 or fabricate." N.J.R.E. 803(c)(1). Here again, for the reasons discussed, the trial court properly concluded that the circumstances under which these statements were uttered rendered them inadmissible.

V

The Offer of Judgment Rule
As we have noted earlier, we are required to analyze the enforcement of plaintiff's offer of judgment under unusual procedural circumstances. Negron's offer of judgment was filed on December 19, 2002. In it, he offered to settle his case against both defendants for $125,000.[6] Under Rule 4:58-1:
[I]f the offer is not accepted on or prior to the 10th day before the actual trial date or within 90 days of its service, whichever period first expires, it shall be deemed withdrawn and evidence thereof shall not be admissible except in a proceeding after the trial to fix costs, interest, and attorney's fee.
Here, it is undisputed that defendant did not accept plaintiff's offer of settlement within the time frame provided by the Rule. Under Rule 4:58-2(a):
If the offer of a claimant is not accepted and the claimant obtains a money judgment, in an amount that is 120% of the offer or more, excluding allowable pre-judgment interest and counsel fees, the claimant shall be allowed, in addition to costs of suit: (1) all reasonable litigation expenses incurred following non-acceptance; (2) prejudgment interest of eight percent on the amount of any money recovery from the date of the offer or the date of completion of discovery, whichever is later, but only to the extent that such prejudgment interest exceeds the interest prescribed by R. 4:42-11(b) which also shall be allowable; and (3) a reasonable attorney's fee, which shall belong to the client, for such subsequent services as are compelled by the non-acceptance.
Here again, it is undisputed that plaintiff obtained a money judgment ($1 million) in an amount in excess of 120% of the offer ($125,000). Thus, the only question remaining is whether the sanctions provided in Rule 4:58-2(a) remain enforceable, even if final judgment is not entered until the completion of three trials. Based on a plain reading of the Rule, and mindful of the public policy underpinning its adoption, we are satisfied that the answer to this question is "yes."
We start our analysis by noting that nothing in the plain text of the Rule requires the offeror to reaffirm an offer filed under Rule 4:58-1, after the first trial *100 results in a mistrial. There is also nothing in the text of the Rule that requires the offeror to reaffirm the offer in the event the final judgment is reversed on appeal. That is, under a plain reading of the Rule, the availability of sanctions provided under Rule 4:58-2 remains open until a judicial decree puts an end to the civil dispute.
Ordinarily, this is accomplished when a final judgment is entered by a trial court pursuant to a jury verdict. There is nothing in the Rule, however, that limits the availability of the sanctions provided in Rule 4:58-2(a) to the costs incurred in connection with a single trial. The only precondition to the filing of an application for sanctions is the entry of a final judgment. Rule 4:58-5. We look to the time restrictions in Rule 4:58-1, for purposes of determining when the fee-shifting consequences are triggered. See Palmer v. Kovacs, 385 N.J.Super. 419, 426, 897 A.2d 429 (App.Div.), certif. denied, 188 N.J. 356, 907 A.2d 1015 (2006).
Our own Offer of Judgment Rule was modeled upon Fed.R.Civ.P. 68;[7] we therefore continue our analysis by reviewing the features of this federal rule, and examining how it has been applied by other jurisdictions. Fed.R.Civ.P. 68 provides:
At any time more than 10 days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against the defending party for the money or property or to the effect specified in the offer, with costs then accrued. If within 10 days after the service of the offer the adverse party serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service thereof and thereupon the clerk shall enter judgment. An offer not accepted shall be deemed withdrawn and evidence thereof is not admissible except in a proceeding to determine costs. If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer. The fact that an offer is made but not accepted does not preclude a subsequent offer. When the liability of one party to another has been determined by verdict or order or judgment, but the amount or extent of the liability remains to be determined by further proceedings, the party adjudged liable may make an offer of judgment, which shall have the same effect as an offer made before trial if it is served within a reasonable time not less than 10 days prior to the commencement of hearings to determine the amount or extent of liability.
As is evident, Fed.R.Civ.P. 68 contains the same basic requirements found in our own Rule 4:58-1 to -5. A parallel review illustrates the point.

 ------------------------------------------------------------------------------------
 FED. R. CIV. P. 68 N.J. OFFER OF JUDGMENT RULE
 ------------------------------------------------------------------------------------
 Offer can only be made by "a party Offer can be made by "any party."
 defending against a claim."
 ------------------------------------------------------------------------------------
 Offer must be made more than 10 days Offer must be made more than 20 days
 before the start of trial. before the start of trial.
 ------------------------------------------------------------------------------------
 Offer must be accepted within 10 days of Offer must be accepted anytime on or
 the date of service. prior to the 10th day of the actual trial
 date, or within 90 days of service.
 ------------------------------------------------------------------------------------
*101
 Consequences of non-acceptance: If Consequences of non-acceptance: When
 "judgment finally obtained" by the offeree offer was made by claimant, offeree is
 is not more favorable than the offer, liable for attorney's fees, enhanced prejudgment
 the offeree is liable for costs incurred interest, and litigation expenses,
 after the making of the offer. commencing from the date of the
 offer's expiration, if the final judgment is
 120% of the offer, or more. When the
 offer was made by non-claimant, offeree
 is liable for attorney's fees, enhanced
 prejudgment interest, and litigation expenses,
 commencing from the date of the
 offer's expiration, if the final judgment is
 80% of the offer, or less.

An explanatory Note published by the Advisory Committee on the 1946 Amendments to Fed.R.Civ.P. 68, provides, in pertinent part, that:
It is implicit . . . that as long as the case continueswhether there be a first, second or third trialand the defendant makes no further offer, his first and only offer will operate to save him the costs from the time of that offer if the plaintiff ultimately obtains a judgment less than the sum offered. In the case of successive offers not accepted, the offeror is saved the costs incurred after the making of the offer which was equal to or greater than the judgment ultimately obtained. These provisions should serve to encourage settlements and avoid protracted litigation.
A number of other jurisdictions have examined the question of how to determine the scope of sanctions, in the context of a multiple trials brought about by remands after appeal. Using Fed.R.Civ.P. 68 as an analytical model, these courts have consistently held that a prevailing offeror is entitled to recover sanctions related to both the initial trial, as well as costs incurred in subsequent trials.
In Cheek v. McGowan, 483 So.2d 1373, 1375 (Fla.Dist.Ct.App.1985), aff'd, 511 So.2d 977 (Fla.1987), the plaintiff sued defendant to collect on a promissory note. Before the first trial, the defendant made an offer of judgment pursuant to Rule 1.442 of the Florida Rules of Civil Procedure. Id. at 1379.[8] After the first trial was completed, the appeals court reversed the judgment. Id. at 1380. As a result of the second trial, the plaintiff's recovery was more favorable than the defendant's offer. Ibid. The trial court ruled, however, that the plaintiff could not recover attorney's fees, because the defendant's offer of judgment was no longer effective. Ibid.
The appeals court reversed, holding that an offer of judgment remained in effect until all rights to appellate review had been exhausted. Ibid. In reaching this decision, the court relied in part on the Advisory Committee Notes on the 1946 Amendment to Fed.R.Civ.P. 68. Ibid. The Florida Supreme Court affirmed the holding of the appeals court, and remanded the case to the trial court to determine appropriate attorney's fees. Cheek, supra, 511 So.2d at 982-83 (Fla.1987).
A similar result occurred in Mackie v. Chizmar, 965 P.2d 1202 (Alaska 1998). In Mackie, the plaintiff-patient sued defendant-doctor for misdiagnosing her HIV test. Id. at 1203. Before trial, the defendant offered to settle the case pursuant to Rule 68 of the Alaska Rules of Civil Procedure. Ibid. Plaintiff rejected the offer. Ibid. After a jury trial, the court entered a directed verdict against plaintiff. Ibid. On appeal, the Alaska Supreme Court reversed *102 in part and remanded the case to the trial court. Ibid.
On remand, both parties agreed to enter into an alternative dispute resolution (ADR) procedure. Ibid. Following the ADR procedure, the trial court awarded plaintiff damages that were less favorable than defendant's offer, and, as a result, defendant sought attorney's fees and costs. Id. at 1204. The trial court ruled that defendant's offer was no longer valid after the entry of judgment in the first trial. Ibid. Although the Alaska Supreme Court concurred with the trial court that the offer was no longer effective because of the ADR procedure, the court disagreed with the trial court's interpretation of Alaska's Offer of Judgment Rule. Ibid. In so doing, the court defined the scope of the Rule, as it related to the availability of sanctions.
[T]he rule provides that the offeree will incur penalties if the judgment "finally" entered by the court is less favorable to the offeree than the Rule 68 offer. A judgment finally entered by a court may well be a judgment entered after appeal and remand. Indeed, the term "finally" implicitly acknowledges the role of appeals and remands in the litigation process because it recognizes that the judgment finally entered may differ from the initial final judgment entered by a trial court.
[Id. at 1205 (internal citation omitted).]
Notably, as did the Court of Appeals of Florida, the Alaska Supreme Court found analytical support for its ruling in the Advisory Committee Notes on the 1946 Amendment to Fed.R.Civ.P. 68. Ibid.
Finally, in Saakyan v. Modern Auto, Inc., 103 Cal.App.4th 383, 126 Cal.Rptr.2d 674, 679 (2002), a case relied on by the trial court here, a panel of the California Court of Appeals held that the sanctions provided under its version of the Offer of Judgment Rule remained available to the prevailing offeror, even after the case was tried for a second time as a result of a remand on appeal.
Saakyan's procedural history is remarkably similar to the procedural anomalies we confront here. The plaintiff sued a car tire distributor and installer for alleged faulty workmanship. Id. at 676. The plaintiffs made an offer to compromise before the first trial, pursuant to section 998 of the California Code of Civil Procedure. Id. at 677. The defendant rejected the offer. Ibid. After the first trial resulted in a special verdict in favor of defendant, the trial court vacated the judgment, and ordered a new trial due to "serious juror misconduct." Ibid.
After the second trial, the jury returned a special verdict in favor of plaintiffs. Ibid. Although the trial court ruled that the special verdict in the first trial extinguished plaintiffs' offer of compromise, the appeals court reversed, holding that an offerer's rights are not terminated when a judgment is vacated and a new trial is ordered. Id. at 679. "[A]ny verdict or judgment entered in advance of a new trial order was merely ephemeral, because [superseded] by the judgment entered after new trial." Ibid.
In addition to the lack of textual support for the notion that an offeror has a duty to reaffirm an offer filed pursuant to Rule 4:58-1 if the first trial results in a mistrial, there is also a clear public policy against engrafting such a requirement by judicial fiat. It is well settled that inducement to the early settlement of cases is the fundamental purpose of the Offer of Judgment Rule. Crudup v. Marrero, 57 N.J. 353, 356-57, 273 A.2d 16 (1971); Palmer, supra, 385 N.J.Super. at 425, 897 A.2d 429; McMahon v. New Jersey Mfrs. Ins., 364 N.J.Super. 188, 192, 834 A.2d 1074 (App. Div.2003); Sovereign Bank v. United Nat'l *103 Bank, 359 N.J.Super. 534, 542, 821 A.2d 87 (App.Div.), certif. denied, 177 N.J. 489, 828 A.2d 917 (2003). As noted by Justice Francis thirty-five years ago in Crudup, supra, 57 N.J. at 356, 273 A.2d 16:
The Offer of Judgment rules, and particularly R. 4:58-2, cast as it is in unqualified mandatory terms, were adopted deliberately by the Supreme Court. They were designed particularly as a mechanism to encourage, promote and stimulate early out-of-court settlement of negligence and unliquidated damage claims that in justice and reason ought to be settled without trial. It is a matter of common knowledge that the vast majority of such cases are ultimately settled. Unfortunately, the disposition too often takes place on the "court house steps" or just before or after a jury is drawn, rather than in the many months that intervene between the institution of the suit and the ultimate trial date.
The sanctions provided in Rule 4:58-2(a) are thus mandatory, Crudup, supra, 57 N.J. at 356-57, 273 A.2d 16, and intended to encourage the early settlement of cases, by making the offeree liable for counsel fees, enhanced prejudgment interest and litigation costs incurred by the offeror after the expiration of the time for acceptance delineated in Rule 4:58-1. When, as here, an offeree makes a strategic decision early on in the litigation not to accept an offer of settlement made by plaintiff through the Offer of Judgment Rule, he or she is held liable for the consequences that flow directly from that decision.
Permitting the offeree to avoid these obligations, simply because the first trial results in a mistrial, would seriously undermine the public policy supporting the creation of the Rule. Defendant nevertheless argues that it would be unfair to enforce the sanctions here, because the trial court's decision to uphold the jury's verdict in favor of Stokes significantly changed the element of risk assumed by defendant when it rejected plaintiff's original offer of settlement. We reject this argument.
Litigation carries with it an unavoidable element of uncertainty. Any experienced trial lawyer knows that claims against multiple parties are often dismissed or modified through pretrial motion practice. See City of Cape May v. Coldren, 329 N.J.Super. 1, 10, 746 A.2d 1003 (App.Div.2000) (applying Rule 4:58-2 to a single remaining count following the entry of partial summary judgment). Juries in multiple-defendant cases are just as likely to exonerate one defendant as they are to reach a final verdict covering all of the parties in a case. In this respect, we are in agreement with our fellow judges in California that "the vagaries of litigation, including the possibility of juror misconduct or reversal on appeal, which increases the opposing party's costs, are part of the risk inherent in rejecting [an offer of judgment]." Saakyan, supra, 126 Cal.Rptr.2d at 680.
We recognize that this outcome leaves the offeror in a clear position of advantage. After the expiration of the acceptance period, the offeror is vested with the irrevocable right to seek the sanctions available under Rule 4:58-2, if the verdict turns out to be in his favor. If the verdict is not favorable, the offeror is not in any worse position than he was prior to the commencement of the trial. In short, under the expressed terms of the Rule, once the acceptance period is over, the offeror risks nothing by going forward with the trial.
Conversely, during this same critical period, the offeree is exposed not only to an unfavorable verdict, but to the sanctions available under the Rule. The offeree is also powerless to mitigate these potential damages, which encompass all costs associated with the proceedings necessary to *104 reach a final judgment in the case. Thus, the Rule's inflexible closure of the window of acceptance transforms the scope of the available sanctions into a hammer, wielded exclusively by the offeror. While we are concerned by this shift in the balance of power between litigants, we discern no textual support in the Rule to introduce our own notion of fairness, in order to counteract this imbalance. Our role as an intermediate appellate court is to interpret and enforce the Rules promulgated by the Supreme Court, not to rewrite them when we detect in their application a disagreeable outcome.
Finally, we reject defendant's argument that we should consider the limits of his liability policy in determining whether the sanctions in Rule 4:58-2 should be enforced here. As recently noted by our Supreme Court, "[t]he language, structure, and policy rationale of the [Offer of Judgment Rule] do not support the notion that plaintiff's offer should be measured against the insurance coverage rather than the verdict." Gonzalez v. Safe & Sound Sec. Corp., 185 N.J. 100, 125, 881 A.2d 719 (2005).

VI

Conclusion and Recapitulation
The verdict against defendant Eugene's Tavern is affirmed. The trial court award to plaintiff of counsel fees, enhanced prejudgment interest, and litigation costs under Rule 4:58-2 is affirmed.
NOTES
[1] We recognize that the Rule was significantly amended effective September 1, 2006. In reaching its decision, the trial court applied the version of the Rule that existed prior to the effective date of these amendments. The sections of the Rule under review here were not modified by these recent amendments.
[2] At trial, Negron testified that he only remembered seeing Lucena being attacked, opening the car door to help him, and being immediately struck from behind.
[3] Otolaryngology is the branch of medicine that deals with the anatomy, function, and diseases of the ears, nose, and throat.
[4] Vargas died before the case reached trial. His deposition testimony was read to the jury.
[5] Earlier in the trial, counsel for both sides had agreed to permit all eight jurors to deliberate. R. 1:8-2(b)(3).
[6] The actual Offer of Judgment document states: "[P]laintiff Ismael Negron hereby offers to allow judgment to be taken against him in this action, in the amount of $125,000." In this light, counsel for Eugene's Tavern urged us at oral argument to construe this misstatement as a material defect, rendering the Offer of Judgment a nullity. We reject this argument on both substantive and procedural grounds. First, we note that defense counsel did not raise this issue before the trial court, nor did he include such an argument in the brief filed in this appeal. Raising an allegedly dispositive argument for the first time at appellate oral argument is inappropriate, and violates rudimentary notions of fairness. Despite this glaring procedural defect, which would amply support a decision declining to address this argument, we will, in the interest of clarity, state that the argument is without merit. It is obvious, even from the most cursory of readings, that the document was intended to convey plaintiff's willingness to accept from defendant the sum of $125,000 to settle the case. The wording indicating that plaintiff would "allow judgment to be taken against him" is nothing more than a classic example of the modern version of scrivener's error. That is, the result of improperly modifying an electronically stored document.
[7] In fact, the pre-1969 Offer of Judgment Rule was taken verbatim from Fed.R.Civ.P. 68. Pressler, Current N.J. Court Rules, comment on Rule 4:58 (2006).
[8] Defendant also made a second offer, which was higher than the first. It was not timely served, however, and the court held it was ineffective. Cheek, supra, 483 So.2d at 1379.