**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2131-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JACOB LLERA,

     Defendant-Appellant.

_____

Submitted May 17, 2021 – Decided August 25, 2021

Before Judges Mayer and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 17-03-0637.

Joseph E. Krakora, Public Defender, attorney for appellant (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).

Jill S. Mayer, Acting Camden County Prosecutor, attorney for respondent (Jason Magid, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant, Jacob Llera, appeals from his jury trial convictions for murder, possession of a weapon for an unlawful purpose, and unlawful possession of a handgun. Defendant contends for the first time on appeal that the trial court erred by failing to provide jury instructions concerning eyewitness identifications, and by allowing the jury to view a recording of defendant's custodial interrogation that included a remark by the interrogating detective that a non-testifying witness had identified defendant as the shooter. Defendant also asserts the trial court erred in imposing sentence by failing to account for a new statutory mitigating factor and by imposing consecutive sentences on the murder and handgun possession convictions. After carefully reviewing the record in light of the arguments of the parties and applicable legal principles, we affirm the trial convictions. We also affirm the sentence imposed for murder. We are unable, however, to affirm the decision to impose consecutive sentences on the record before us because the trial court did not elaborate on the fairness of the overall sentence as required by the New Jersey Supreme Court's recent decision in State v. Torres, 246 N.J. 246 (2021). We therefore are constrained to remand for a new sentencing proceeding at which the trial court shall address whether

2

imposition of consecutive sentences is warranted considering the fairness of the overall sentence.

## I.

Defendant was charged by indictment with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); and second-degree unlawful possession of a handgun, N.J.S.A. 2C: 39-5(b). He was tried before a jury over the course of six days in October 2018. The jury returned a guilty verdict on all counts.

In January 2019, the trial judge sentenced defendant on the murder conviction to a forty-year prison term, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The judge merged the conviction for possession of a weapon for an unlawful purpose with the conviction for murder. On the conviction for unlawful possession of a handgun, the court imposed a seven-year prison term with a forty-two-month period of parole ineligibility under the Graves Act, N.J.S.A. 2C:43-6(c), to be served consecutively to the NERA sentence imposed for murder.

We briefly summarize the facts adduced at trial that are relevant to the issues raised on appeal. On September 8, 2015, at around 8:20 p.m., Camden County Police Department Officer Nicole Berry heard four or five gunshots

while she was on patrol at the intersection of Broadway and Stevens Street in Camden. As she exited her police vehicle, a man ran towards her and collapsed. The victim later was identified as Saadiq Coleman. Officer Berry called for an ambulance and began to render aid. Coleman, who was nineteen years old, later succumbed to gunshot wounds to his chest and thigh.

A Camden resident was walking with his son on Broadway when he heard the gunshots. He testified he saw a group of people running down Broadway, including a dark-skinned man with white pants and a darker-colored shirt. He observed the man take off his shirt as he was running across Broadway.

Homicide Detective Michael Rhoads of the Camden County Prosecutor's Office arrived at the scene at about 8:40 p.m. He was unable to locate additional eyewitnesses. The detective collected video surveillance footage from Rowan Medical Center, a school, and nearby businesses. He pieced together clips from the surveillance recordings and provided video to the media to enlist the public's assistance in identifying potential suspects and witnesses. Surveillance footage depicting the actual shooting was not disseminated to the public.

Defendant's sister, Leila Llera, contacted the police and identified herself as one of the individuals shown in the publicly disseminated surveillance video. She met with Detective Rhoads and provided a statement, which was

electronically recorded. Leila[1] stated defendant was at a fast-food restaurant in the neighborhood and was wearing a black shirt and white pants. When the gunshots rang out, people scattered, including her brother. At first, Leila claimed she did not see who fired the shots, but eventually informed Detective Rhoads she saw her brother shoot the victim several times.

At trial, Leila claimed she could not recall information about the incident she had related in her recorded statement. The trial court determined her memory lapses were feigned and allowed the video recording of her statement to be played for the jury.

Defendant's other sister, Niurka Suriel, also testified and confirmed that Leila and defendant were depicted in the surveillance video.

On September 12, 2015—four days after the homicide—defendant called Detective Rhoads after being advised by his family that he appeared in the surveillance video that had been publicly disseminated. Detective Rhoads informed defendant there was a warrant for his arrest. During the telephone conversation, defendant stated that he had been wearing white pants and a blue shirt. He told the detective he would report to the prosecutor's office that

---

[1] Because defendant and his sister have the same last name, we use her first name to avoid confusion. We mean no disrespect in doing so.

afternoon to turn himself in. Defendant never showed up. Four days later, defendant was arrested by U.S. Marshals in Philadelphia, Pennsylvania.

Defendant agreed to answer questions and gave a statement to Detective Rhoads. The stationhouse interrogation was electronically recorded and was played at trial. Defendant stated he had a close relationship with the victim, explaining, "I know Saadiq. That's – that's – he know[s] my whole family. He [is] related to me. That's my second cousin." When Detective Rhoads asked what defendant was wearing during the incident, defendant replied, "I had white pants on. I had white pants on and a black shirt."

Defendant then recounted his version of the events leading up to the shooting. Defendant told Detective Rhoads he approached Coleman to purchase marijuana. Defendant was walking with an acquaintance, Siefuddiyn Holland. Defendant claimed Coleman handed the marijuana to defendant and then pushed him away, saying "later bro. Get up out of here." Defendant claimed he heard gunshots as he was being pushed away. As defendant was running, he observed "some chubby fat dude in all black. That's what he was wearing, all black. He came from like the bushes." When Detective Rhoads told defendant there are no bushes at that location, defendant claimed to be talking about figurative bushes, "[l]ike he came out of there like – he came out of nowhere and was

A-2131-18

talking . . . like we knew each other." Defendant claimed this individual shot Coleman.

The State at trial also played an audio recording of a call defendant made from the county jail on March 8, 2018. The other participant in the jailhouse call was not identified. During the conversation, defendant explained that his sister was the State's main witness against him. Defendant further stated he told his sister that if the family members do not show up, "they have to release me – they have to let me go – cause' they don't have nobody – you know what I'm saying – I don't got nobody telling on me but my family." Defendant remarked that the video of the shooting did not clearly depict the shooter and the only thing that was "fucking him over" was his family. Defendant agreed with the unidentified male's statement that Leila was "in the way – she in the way big bro[,]" and explained that one of his "little homies" was about to go to the State Prison facility where Leila was incarcerated. Defendant stated he told his "homie" to tell his sister to retract the statement she had given to police, adding that if Leila "don't take it [her statement implicating defendant] back [the female "homie" is] gonna beat her up."

Defendant testified at trial in his own defense. He denied shooting Coleman and offered three potential shooters: an individual wearing all black

7

on a bike, a man wearing white plants and a blue shirt who had been walking with Coleman and Holland, and a third man wearing a white t-shirt and riding a bike. Defendant also testified Holland was in possession of a handgun and was mad about something.

On appeal, defendant raises the following contentions for our consideration:

> POINT I
>
> BECAUSE IDENTIFICATION WAS THE CENTRAL CONTESTED ISSUE IN THE CASE, DEFENDANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY THE TRIAL COURT'S FAILURE TO PROVIDE ANY IDENTIFICATION INSTRUCTION WHATSOEVER TO THE JURY. U.S. CONST., AMENDS. V, VI, AND XIV; N.J. CONST., ART. I, PARS. 1, 9, AND 10 (not raised below)
>
> POINT II
>
> ADMISSION OF THE HEARSAY STATEMENT THAT HOLLAND HAD IDENTIFIED DEFENDANT AS THE SHOOTER DENIED DEFENDANT OF HIS RIGHTS TO CONFRONTATION AND A FAIR TRIAL. U.S. CONST., AMENDS. V, VI, AND XIV; N.J. CONST., ART. I, PARS. 1, 9, AND 10 (not raised below)
>
> POINT III
>
> THE MATTER SHOULD BE REMANDED FOR RESENTENCING BECAUSE THE SENTENCING COURT ERRED IN IMPOSING A CONSECUTIVE

SENTENCE ON THE CONVICTION FOR UNLAWFUL POSSESSION OF A WEAPON

Defendant submitted a pro se supplemental letter raising the following arguments:

POINT I

BECAUSE IDENTIFICATION WAS THE CENTRAL CONTESTED ISSUE IN THE CASE, DEFENDANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY THE TRIAL COURT'S FAILURE TO PROVIDE ANY IDENTIFICATION INSTRUCTIONS WHATSOEVER TO THE JURY U.S. CONST., AMENDS. V, VI, AND XIV; N.J. CONST., ART. I, PARS. 1, 9, AND 10 (not raised below)

A. THE TRIAL COURT ERRED IN ALLOWING PREJUDICIAL TESTIMONY FROM DEFENDANT'S SISTER LEILA AFTER INFORMING INVESTIGATORS THAT HER STATEMENT [WAS] FALSE IN THE BEGINING [sic] AND SHE COULD NOT REMEMBER WHAT HAPPENED THE NIGHT OF THE INCIDENT

B. THE TRIAL COURT ERRED IN ALLOWING THE ADMISSION OF THE HEARSAY STATEMENT THAT HOLLAND HAD IDENTIFIED DEFENDANT AS THE SHOOTER DENIED DEFENDANT OF HIS RIGHTS TO CONFRONTATION AND A FAIR TRIAL, U.S. CONST. AMENDS. V, VI, XIV; N.J. CONST., ART. 1, PARS. 1, 9, AND 10 (not raised below)

9

## II.

We first address defendant's contention that the trial court committed plain error by failing to sua sponte provide the model jury instruction relating to eyewitness identifications. "It is a well-settled principle that appropriate and proper jury charges are essential to a fair trial," and that a jury charge functions as a "'road map to guide the jury and without an appropriate charge a jury can take a wrong turn in its deliberations.'" State v. Savage, 172 N.J. 374, 387 (2002) (quoting State v. Martin, 119 N.J. 2, 15 (1990)). "[A] request for jury instructions shall be granted when those instructions relate to 'essential and fundamental issues and those dealing with substantially material points.'" State v. Davis, 363 N.J. Super. 556, 561 (App. Div. 2003) (quoting State v. Green, 86 N.J. 281, 290 (1981)).

In this instance, defendant did not request an eyewitness identification instruction. When, as in this case, a defendant does not object to the charge, "there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case." State v. Montalvo, 229 N.J. 300, 320 (2017) (quoting State v. Singleton, 211 N.J. 157, 182 (2012)). However, the failure to provide the eyewitness identification instruction may constitute

reversible error even when that instruction is not requested. See State v. Cotto, 182 N.J. 316, 326 (2005); Davis, 363 N.J. Super. at 561.

Defendant's argument, raised for the first time on appeal, presupposes that an eyewitness identification instruction was appropriate and necessary in this case. This argument fundamentally misconstrues the nature and purpose of that jury charge. In State v. Sanchez-Medina, our Supreme Court also addressed a "missing instruction on identification . . . for plain error." 231 N.J. 452, 468 (2018). The Court began by tracing the development of the law on eyewitness identifications, noting that it had addressed this topic on a number of occasions in recent years. Id. at 466. Notably, in 2011, the Court in State v. Henderson closely examined expert testimony and scientific studies concerning a number of variables that affect human memory. 208 N.J. 208 (2011). Chief Justice Rabner addressed the frailties of human perception and memory that can lead to misidentification, setting forth a comprehensive list of so-called system and estimator variables that affect the reliability of eyewitness identifications.[2] Id.

---

[2] System variables in eyewitness identification are those circumstances created or controlled by law enforcement, such as photo array procedures. They are distinguished from estimator variables over which law enforcement has no control such as lighting conditions, the amount of time the witness had to observe the offender, whether the witness's attention was focused on a weapon, and the degree of stress experienced by the witness.

at 261–72.  Based on that body of scientific evidence, the Court directed that new jury instructions be developed.  Id. at 298–99.  The following year, the Court approved new model jury charges on eyewitness identification, which address various factors such as memory decay, stress, and the duration of the crime.  Model Jury Charge (Criminal), "Identification: In-Court and Out-Of-Court Identifications" (rev. May 18, 2020).

In Sanchez-Medina, the Court reaffirmed that "[w]hen eyewitness identification is a 'key issue,' the trial court must instruct the jury how to assess the evidence—even if defendant does not request the charge."  231 N.J. at 466 (citing State v. Cotto, 182 N.J. 316, 324 (2005)); see also Davis, 363 N.J. Super. at 561 (noting "as a matter of general procedure a model identification charge should be given in every case in which identification is a legitimate issue") (citing State v. Copling, 326 N.J. Super. 417, 434 (App. Div. 1999)).  However, eyewitness identification within the meaning of Henderson and its progeny was not a key issue in this case.  Defendant did not dispute that he was present at the crime scene when the fatal shots were fired.  Defendant's argument—reflected in his own trial testimony—was that someone else fired.  Accordingly, the key issue for the jury to decide was not whether Leila had misidentified her own

brother but rather whether she was truthful when she told Detective Rhoads she saw defendant shoot the victim multiple times.[3]

The eyewitness identification charge, drafted in accordance with Henderson, is designed to provide guidance to juries in gauging a witness's capacity to testify reliably that the defendant-at-bar is the particular person the eyewitness observed at the scene and time of the crime. Where the eyewitness is the defendant's sibling—as in this case—there simply is no significant risk the witness would misidentify the culprit within the meaning of Henderson.

In these circumstances, the model identification charge explaining the risk of eyewitness misidentification would not have been helpful—and might even have been confusing—in contrast to the witness credibility jury instruction that was given to the jury. We thus conclude the failure to give the eyewitness identification jury charge was not error, much less plain error capable of producing an unjust result. R. 2:10-2; see also Cotto, 182 N.J. at 326 (noting

---

[3] We add the trial court did not abuse its discretion in admitting Leila's electronically recorded statement pursuant to N.J.R.E. 803(a) after finding that her lack of recollection at trial was feigned. See State v. Brown, 138 N.J. 481, 541–46 (1994) (prior statement of a witness is admissible in a criminal trial as a prior inconsistent statement where the witness maintains he or she cannot recall incidents related in his or her earlier statement and the trial judge finds that the memory lapse was feigned).

although "[f]ailure to issue [an identification] instruction may constitute plain error," that "determination . . . depends on the strength and quality of the State's corroborative evidence") (internal citations omitted).

## III.

We turn next to defendant's contention that the trial court violated his Confrontation Clause rights by allowing the jury to view the unredacted stationhouse statement defendant gave to police following his arrest. At one point during the interrogation, Detective Rhoads stated that Holland told police that defendant was present at the scene and shot Coleman. We reproduce the pertinent portion of the recorded interrogation:

> Detective Rhoads: Okay. There was multiple people that identified you as shooting Saadiq.
>
> Defendant: Like who? Let me know.
>
> Detective Rhoads: You want to know?
>
> Defendant: Yeah.
>
> Detective Rhoads: Your sister for one. All right. This is real. I'm going to be real with you. All right. So be real with me. Your sister, Leila. All right. She identified you. She was out there. All right. This is how real it is, so I need for you to be honest with me right now.
>
> Defendant: No, I didn't shoot that – I didn't do nothing like that.

14

> Detective Rhoads: Sir, everybody is a liar including the video?
>
> Defendant: Huh?
>
> Detective Rhoads: Your boy [Holland] put you there too.
>
> Defendant: What do you mean?
>
> Detective Rhoads: He put you there. He identified you as being right there shooting. Everybody is looking out for themselves. All right. They're not going down for this. You think they're going to put their neck out for you? Come on.

The record shows that in reality, Holland had <u>not</u> implicated defendant as the shooter. At the suppression hearing conducted on October 11, 2018—less than one week before the trial started—defense counsel established during the cross-examination of Detective Rhoads that while Holland had stated that defendant was present at the scene, he had not claimed that defendant was the shooter. We reproduce the pertinent portion of the suppression hearing cross-examination:

> Defense counsel: So part of what you just said in that video recording to [defendant] about Mr. Holland was not correct. Right?
>
> Detective Rhoads: In terms of what, counselor?

Defense Counsel: You said that Mr. Holland identified [defendant] as being -- being there. You said that to [defendant]. Correct?

Detective Rhoads: Yes. He identified him being there. He didn't identify him as the shooter.

Defense Counsel: In fact, he refused to identify – he said --

Detective Rhoads: Yeah. It's understandable. He didn't want to -- to identify his friend. I get it.

Defense counsel did not request the video recording of the interrogation be redacted, or that the jury be instructed not to consider Detective Rhoad's reference to Holland's statement as substantive evidence of defendant's complicity in the shooting. Defendant now argues for the first time on appeal the admission of Holland's hearsay statement violated defendant's Confrontation Clause rights because there was no opportunity for counsel to cross-examine Holland, who died before trial.

We begin our analysis of this contention by acknowledging certain bedrock principles of our criminal justice system. The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution afford an accused the right "to be confronted with the witnesses against him." U.S. Const. amend. VI; N.J. Const. art. I, para. 10. That right "is

16

an essential attribute of the right to a fair trial, requiring that a defendant have a 'fair opportunity to defend against the State's accusations.'" State v. Branch, 182 N.J. 338, 348 (2005) (quoting State v. Garron, 177 N.J. 147, 169 (2003)).

Our Supreme Court in Branch held that "both the Confrontation Clause and the hearsay rule are violated when, at trial, a police officer conveys, directly or by inference, information from a non-testifying declarant to incriminate the defendant in the crime charged." 182 N.J. at 350 (citing State v. Bankston, 63 N.J. 263, 268–69 (1973)). More recently, the Court in State v. Weaver explained that "[w]hen evidence is admitted that contravenes not only the hearsay rule but also a constitutional right, an appellate court must determine whether the error impacted the verdict." 219 N.J. 131, 154 (2014) (citing Chapman v. California, 386 U.S. 18, 24 (1965)). "The standard has been phrased as requiring a reviewing court 'to declare a belief that [the error] was harmless beyond a reasonable doubt.'" Ibid. (alteration in original) (citing Chapman, 386 U.S. at 24); see also Branch, 182 N.J. at 353 (applying the plain error standard where a defendant fails to object to erroneously admitted evidence by determining whether the evidence is "clearly capable of producing an unjust result"); State v. Singh, 245 N.J. 1, 13 (2021) (reaffirming that an unchallenged error "'will be disregarded unless a reasonable doubt has been raised whether the jury came to

a result that it otherwise might not have reached'") (quoting State v. R.K., 220 N.J. 444, 456 (2015)).

In this instance, we believe Detective Rhoads's reference to statements attributed to Holland should have been redacted from the video recording before it was played to the jury. But because defendant's Confrontation Clause claim was not raised below, we must review the circumstances to determine if the admission of the unredacted recording impacted the verdict.

Importantly, this was not a situation where counsel failed to object to an unexpected and spontaneous hearsay statement. On the contrary, the record makes clear that counsel at trial was keenly aware of the content of the recorded interrogation, including the portion relating to hearsay statements attributed to Holland. Indeed, as we have noted, just days before trial, counsel at the suppression hearing focused on that hearsay statement and elicited from Detective Rhoads on cross-examination that Holland had not claimed that defendant was the shooter.

Notwithstanding this knowledge, counsel did nothing to prevent the jury from hearing the detective's remark to defendant when the video-recorded interrogation was played at trial. Nor did counsel at trial cross-examine

18

Detective Rhoads to elicit for the jury that Holland had not identified defendant as the shooter.

It is thus reasonably apparent that counsel made a strategic decision to allow the jury to hear Holland's hearsay statement via Detective Rhoads' questioning during the custodial interrogation. We note defendant testified that Holland brought a gun to the scene and was angry. Defendant also suggested that one of Holland's associates may have fired the weapon. The notion that Holland would try to protect himself and his associate by deflecting blame onto defendant was consistent with defendant's trial testimony. It thus is understandable why counsel would strategically choose not to elicit from Detective Rhoads at trial that Holland in fact had not identified defendant as the shooter.

In State v. Bueso, we noted the plain error standard aims to "provide[] a strong incentive for counsel to interpose a timely objection, enabling the trial court to forestall or correct a potential error." 225 N.J. 193, 203 (2016). It also is well-settled that trial errors that "were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal . . . ." State v. Corsaro, 107 N.J. 339, 345 (1987) (quoting State v. Harper,

128 N.J. Super. 270, 277 (App. Div. 1974)); see also State v. A.R., 213 N.J. 542, 561 (2013) ("Mistakes at trial are subject to the invited-error doctrine.").

We conclude that in this instance, counsel made a strategic election not to seek the redaction of Holland's hearsay statement and thus acquiesced in its disclosure to the jury. See Bueso, 225 N.J. at 203. In these circumstances, and considering the overall strength of the State's case, see State v. Chapland, 187 N.J. 275, 289 (2006), we conclude the error in permitting the jury to hear the statement attributed to Holland was harmless beyond a reasonable doubt. See Weaver, 219 N.J. at 154–55.

IV.

We turn next to defendant's contention that the trial court erred in imposing sentence. The scope of our review of sentencing determinations is limited and highly deferential. See State v. Pierce, 188 N.J. 155, 166–67 (2006); State v. Jarbath, 114 N.J. 394, 401 (1989).

A.

We first address defendant's argument we should remand for the sentencing court to retroactively apply a recent revision to the penal code. On October 19, 2021, the Governor signed legislation establishing a statutory mitigating factor, codified at N.J.S.A. 2C:44-1(b)(14), when the defendant was

20

under 26 years of age at the time of the commission of the offense. Here, defendant was twenty years old at the time of the murder.

We need not decide whether the new sentencing provision must be applied retroactively because in this instance, the sentencing court accounted for defendant's youth as a non-statutory mitigating circumstance. Indeed, the court relied principally on defendant's age to impose a sentence below the midpoint of the sentencing range for murder. Cf. State v. Natale, 184 N.J. 458, 488 (2005) ("We suspect that many, if not most, judges will pick the middle of the sentencing range as a logical starting point for the balancing process and decide that if the aggravating and mitigating factors are in equipoise, the midpoint will be an appropriate sentence. That would be one reasonable approach, but it is not compelled.")

Specifically, the sentencing court explained,

> I've considered the defendant at the time was 20 years of age. He's 23 as he stands before me today. Based on in the interest of justice with this 23-year-old young man standing before me, age 20 at the time of this incident, I find in the interest of justice I will go below the 51-year midrange.

The court later reiterated,

> I've gone below that midrange, taking into account that he had – he was 20 years of age, that he did not have an adult record. And I don't know when he was released

21

on that four-year sentence he served. I don't know when he was released. I don't know if he was just released, but I've taken into account of his age and his lack of adult record. But I can't disregard that he has a history of criminal violence. But, yet, I went well below that midrange number.

We are satisfied the sentencing judge carefully and thoroughly considered all relevant aggravating and mitigating circumstances—including defendant's youth—and ultimately imposed a sentence on defendant's murder conviction that was not "clearly unreasonable so as to shock the judicial conscience." See State v. Liepe, 239 N.J. 359, 371 (2019) (quoting State v. McGuire, 419 N.J. Super. 88, 158 (App. Div. 2011)).

## B.

We next address defendant's contention that the trial court erred in imposing consecutive sentences on the murder and handgun convictions. In State v. Yarbough, the Supreme Court embraced the foundational principle that "there can be no free crimes in a system for which the punishment shall fit the crime." 100 N.J. 627, 643 (1985). The Court listed relevant considerations in determining whether to impose consecutive sentences, including:

> (a) the crimes and their objectives were predominantly independent of each other;
>
> (b) the crimes involved separate acts of violence or threats of violence;

22

(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous[.]

[Id. at 644.]

In State v. Cuff, the Court recognized "the Yarbough factors are qualitative, not quantitative; applying them involves more than merely counting the factors favoring each alternative outcome." 239 N.J. 321, 348 (2019); see also State v. Molina, 168 N.J. 436, 442–43 (2001) (affirming consecutive sentences although "the only factor that support[ed] consecutive sentences [was] the presence of multiple victims"); State v. Carey, 168 N.J. 413, 427–28 (2001) (holding that "a sentencing court may impose consecutive sentences even though a majority of the Yarbough factors support concurrent sentences").

In the present case, the sentencing court explained,

I note that there are multiple crimes here. There's weapon charges and there's a murder charge. I note that Yarbough talks about there shall be – there can be no free crimes in the system for which the punishment shall fit the crime.

I find that the possession of a weapon – unlawful possession of the weapon is a separate crime in and of

23

itself. The defendant is in possession of a loaded firearm on a city street in a community. In looking at the video, where there are several civilians in that area. He's in possession of a loaded firearm. There's no permit for the firearm.

I find that this crime is independent of the murder in and of itself. I find that for those reasons I do find that this should be a consecutive sentence.

We agree with the sentencing court that in the particular circumstances of this case, the criminal act of carrying a loaded handgun in public was independent of the murder and posed risks to others in addition to the murder victim. That finding by the sentencing court supports the decision to impose consecutive sentences.[4] See Molina, 168 N.J. at 442–43. But the required analysis does not stop there. In Torres, our Supreme Court recently[5] explained:

> Yarbough's second factor requires a sentencing court to place on the record its statement of reasons for the decision to impose consecutive sentences, which statement, we have directed, should focus 'on the fairness of the overall sentence, and the sentencing

---

[4] As we have noted, the conviction for possession of a weapon for an unlawful purpose was properly merged with the conviction for murder because the unlawful purpose was to commit the homicide.

[5] Torres was decided on May 11, 2021. The Supreme Court did not announce a new rule; thus, the principles set forth in the opinion clearly apply to the present sentencing proceeding. The Court emphasized in this regard, "[o]verall fairness has long been a necessary consideration to the imposition of consecutive versus concurrent sentencing." Torres, 246 N.J. at 274.

24

court should set forth in detail its reasons for concluding that a particular sentence is warranted.'

[246 N.J. at 267–68 (quoting State v. Miller, 108 N.J. 112, 122 (1987)).]

The Court further explained that the penal code's sentencing goals of uniformity and predictability "should not come at the expense of fairness and proportionality." Id. at 270. "Toward that end, the sentencing court's explanation of its evaluation of the fairness of the overall sentence is 'a necessary feature of any Yarbough analysis.'" Ibid. (citing Cuff, 239 N.J. at 352).

The Court reaffirmed that "[a]ppellate courts employ the general shock-the-conscience standard for review of the exercise of sentencing discretion in the arena of consecutive-versus-concurrent sentencing." Id. at 272 (quoting State v. Roth, 95 N.J. 334, 364–65 (1984)). The Court nonetheless made clear that because the Legislature has yet to provide precise guidance to trial courts in deciding whether to impose concurrent or consecutive sentences, "appellate review of lengthy[6] consecutive sentences is therefore the only check for

---

[6] In Torres, the Court imposed consecutive thirty- and forty-year sentences on the defendant's convictions for separate robberies committed in different years. In the present case, the court imposed a forty-year NERA term with a thirty-four-year period of parole ineligibility on the murder conviction and a seven-year Graves Act term with a forty-two-month period of parole ineligibility on the handgun possession conviction. We do not read Torres to apply only where

25

pervading unfairness." Ibid. "But although the standard is deferential," the Court stressed, "that review is critical." Ibid. The Court added, "[t]o facilitate that vital review—and to eliminate any possibility of lingering doubt—we hold that an explanation for the overall fairness of a sentencing court is required . . . ." Ibid.

The Court concluded in Torres that "the explanation of the overall fairness of the consecutive sentences imposed on [the defendant] was lacking," id. at 270, prompting the Court to remand for resentencing. So too in the case before us, the record does not show that the sentencing court expressly considered the impact of the consecutive Graves Act sentence on the overall fairness of the sentence imposed. The sentencing court, we note, conducted a commendably thorough analysis of the pertinent aggravating and mitigating factors, carefully tailoring the sentence imposed on the murder conviction to account for those factors.[7] With respect to the consecutive-versus-concurrent decision, however,

---

both sentences involve "lengthy" prison terms. Rather, the gravamen of Torres is that a trial court must consider whether the arithmetic sum of consecutive sentences is fair and warranted, regardless whether that sum is composed of sentences of markedly different lengths as in this case.

[7] We note the trial court might have arrived at the same overall sentence—measured by the aggregate period of parole ineligibility—by imposing a longer prison term on the murder conviction and a concurrent sentence on the handgun

the court focused entirely on the independent nature of the murder and gun possession offenses.[8] We therefore deem it necessary to remand the matter for the court to complete the Yarbough/Torres analysis and to make an explicit determination as to the fairness of the aggregate sentence, that is, the total amount of time defendant will remain in prison if the NERA and Graves Act sentences are served consecutively. We leave this analysis in the first instance to the trial court and offer no opinion on whether the overall sentence imposed at the original sentencing proceeding was unfair.

To the extent we have not addressed them, any remaining arguments raised in defendant's counseled brief or pro se letter lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed in part; vacated and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

conviction. We do not envision that the court on remand will alter the sentence imposed on the murder conviction, which we affirm.

[8] The trial court explained, "I find, under Yarbough, that possession of that weapon was independent in and of itself of the murder and that's the basis for my consecutive sentence." (emphasis added).

A-2131-18